IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

HENRY CLAY JENKINS,

          Petitioner,

v.                                  Case No.: 2:16-cv-06789

DAVID BALLARD, Warden,
Mount Olive Correctional Complex,

          Respondent.

## PROPOSED FINDINGS AND RECOMMENDATIONS

Pending before the court are Petitioner Henry Clay Jenkins's ("Petitioner") *pro se* Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, (ECF No. 2); Petitioner's Motion for Summary Judgment, (ECF No. 15); Respondent's Motion for Summary Judgment, (ECF No. 18); Petitioner's Renewed Motion for Summary Judgment, (ECF No. 25); and Petitioner's Motion to Exceed Page Limitation for Objection to Respondent's Motion for Summary Judgment, (ECF No. 32). This case is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and by standing order is referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B).

The undersigned **GRANTS** Petitioner's Motion to Exceed Page Limitation for Objection (ECF No. 32). The information provided in Petitioner's Objection has been

considered in evaluating the pending issues. The undersigned **FINDS** that the record before the Court is well-developed and provides a sufficient basis upon which to resolve this matter without need for an evidentiary hearing. *See* Rule 8, Rules Governing Section 2254 Cases.

After thorough consideration of the record, the undersigned conclusively **FINDS** that (1) there are no *material* factual issues in dispute and (2) Petitioner is not entitled to the relief requested. Therefore, for the reasons that follow, the undersigned respectfully **RECOMMENDS** that the District Court **GRANT** Respondent's Motion for Summary Judgment; **DENY** Petitioner's Petition for a Writ of Habeas Corpus; **DENY** Petitioner's Motion for Summary Judgment; **DENY** Petitioner's Renewed Motion for Summary Judgment; and **DISMISS** this case from the docket of the Court.

## I.   Relevant Facts and Procedural History

### A.  Pretrial Proceedings and Trial

On September 9, 2009, Petitioner was indicted in the Circuit Court of Fayette County, West Virginia on four counts related to the death of his minor child, C.C.J.,[1] from a drug overdose. Ten months earlier, on November 14, 2008, C.C.J. suffered a cardiac arrest at his father's home in Fayette County. C.C.J. was taken by ambulance to a local hospital, where he received resuscitative treatment, and was transferred later that day to a tertiary care center in Charleston, West Virginia. Five days later, C.C.J. was declared dead. His body was sent to the West Virginia State Medical Examiner's ("M.E.") Office for autopsy. A toxicology report prepared through the M.E.'s Office confirmed the presence of oxycodone and benzodiazepine in C.C.J's blood, and these drugs were thought to have

---

[1] Because the victim was a minor, the undersigned uses the victim's initials. *See* LR Civ P 5.2.1(a).

resulted in his death. C.C.J. did not have a prescription for either of those controlled substances.

The Fayette County Grand Jury charged Petitioner with: (1) felony murder under W. Va. Code § 61-2-1; (2) delivery of a controlled substance, oxycodone, in violation of W. Va. Code § 60A-4-401; (3) death of a child by a parent under W. Va. Code § 61-8D-2a; and (4) child neglect resulting in death under W. Va. Code § 61-8D-4a(a). (ECF No. 18-1). Specifically, Count 1 alleged that Petitioner "murder[ed] C.C.J., during the commission of the felony offense of delivering to said C.C.J. oxycodone, a Schedule II narcotic controlled substance." (*Id.* at 2). Count 2 alleged that Petitioner "deliver[ed] a Schedule II narcotic controlled substance, to-wit: oxycodone." (*Id.*). Count 3 alleged that Petitioner "inflict[ed] upon C.C.J., a child under his care, custody or control, impairment of physical condition, by other than accidental means; thereby causing the death of the said C.C.J." (*Id.* at 3). Count 4 alleged that Petitioner, "the parent of C.C.J[.], who was under his care, custody, or control failed to get C.C.J[.] timely necessary medical treatment and/or allowed or permitted him to abuse controlled substances and such neglect resulted in the death of said C.C.J[.]" (*Id.*).

On March 4, 2010, the trial court held a hearing regarding the admissibility of evidence of other acts under West Virginia Rule of Evidence 404(b). (ECF No. 18-3). The State sought to admit testimony by C.C.J.'s mother and grandmother regarding two prior instances in which Petitioner allegedly gave C.C.J. medications without a prescription. At the hearing, counsel for Petitioner argued that the court should withhold its ruling until counsel could verify that the toxicology report was based on a blood sample drawn from C.C.J. prior to him receiving treatment for the cardiac arrest. Counsel argued that the testimony regarding alleged prior acts would be irrelevant if the blood sample used by the

M.E. was taken after C.C.J. received treatment, because the State would not be able to prove when and from whom C.C.J. received the substances reflected on the toxicology report. (*Id.* at 4–6).

On March 29, 2010, Petitioner filed a Motion to Elect, arguing that the State should be required to elect which Counts it was choosing to prosecute. (ECF No. 18-2). In the Motion, Petitioner argued that the State should not be permitted to prosecute Petitioner under a felony murder theory, Count 1, and also for the underlying felony of delivery of a controlled substance, Count 2, which would place Petitioner in double jeopardy for the same alleged action. (*Id.* at 4–5). Petitioner additionally argued that felony murder, Count 1, and death of a child by a parent, Count 3, had the same elements and violated the principles of double jeopardy. (*Id.* at 3). Petitioner further urged the Court to require the State to choose between the felony murder charge, Count 1, and the charge of child neglect resulting in death, Count 4, contending that the intent elements of the two charges were contradictory, thus precluding Petitioner from being found guilty of both. (*Id.* at 3). Petitioner added that Count 4 was internally flawed because it alleged two separate theories of the case: allowing or permitting C.C.J. to abuse a controlled substance, which would be duplicative of Count 1, or failure to seek prompt medical attention for C.C.J., which would make the evidence of delivery superfluous. (*Id.* at 4).

The court held a hearing on March 30, 2010 to address the Motion to Elect. (ECF No. 18-4). The court determined that it was too early to force the prosecution to make an election and that any prejudice to the defendant caused by presenting all four charges to the jury during opening argument could be minimized. (*Id.* at 26). The trial court took the motion under advisement and noted that, at the time of jury instruction, it would only instruct the jury as to possible verdicts supported by the law and evidence. (*Id.*).

4

Petitioner's jury trial began on May 4, 2010. (ECF No. 18-8 at 5). At trial, Petitioner was represented by two attorneys acting as co-counsel. (*Id.*). Prior to jury selection, the parties discussed a motion in limine filed by Petitioner regarding the admissibility of autopsy photographs of C.C.J. (*Id.* at 5–12). Defense counsel argued that the photographs were prejudicial given that images of a dead child are inherently gruesome. Moreover, counsel asserted that the images were irrelevant because, unlike in the case of a violent death, pictures of an overdose victim would not help the jury understand the manner of death. (*Id.*). The State responded that it wanted to admit a photograph that included only a portion of C.C.J.'s middle and lower back, to show the presence of scratches on his body; the State did not intend to display C.C.J.'s full body or face. (*Id.*). According to the prosecutor, this evidence would corroborate the M.E.'s testimony that C.C.J. had such scratches, which the M.E. would testify were telltale signs that C.C.J. had ingested the drugs found in his blood. (*Id.*). The trial court found that the probative value outweighed the prejudicial value of the photographs and denied Petitioner's motion. (*Id.*).

Partway through the process of jury selection, the State moved orally to dismiss Count 4, and the court granted the motion. (ECF No. 18-8 at 62–64). However, after closing arguments, the jury instructions explained that the charge of "child neglect resulting in death," previously included in Count 4, was now a lesser-included offense of Count 3, "death of a child by a parent." (ECF 18-10 at 34).

As its first witness, the State called Mr. David Neal, director of the Fayette County 911 Center. (ECF No. 18-8 at 107–10). Mr. Neal testified that at 10:20 a.m. on November 14, 2008, the 911 Center received a call relating to C.C.J. and immediately dispatched two ambulances. He also authenticated exhibits, including a 911 OES Incident Form and a CD

containing an audio recording of the 911 call. (*Id.* at 112). The audio recording was published to the jury.

Next, the State called Mr. Shaun Holcomb, a paramedic who responded with others to the 911 call, arriving on the scene at 10:27 a.m. (*Id.* at 113–17). Mr. Holcomb testified that when he arrived, C.C.J. was in cardiac arrest. (*Id.*). In addition to C.C.J., two males and one female, Holly Burdette, were present at the scene, but Petitioner was not there for the first few minutes. (*Id.*). The paramedics provided medical care at the scene and then transported C.C.J. to Plateau Medical Center's Emergency Room, arriving at 10:47 a.m. (*Id.*). On cross-examination, trial counsel asked questions about the details of the call response. (*Id.* at 119–26). Mr. Holcomb testified that he had not been told that C.C.J. had cystic fibrosis, but that the standard of care would not have changed if he had known that. (*Id.*). He testified that he knew Ms. Burdette because he had seen her during several other calls, but he did not recognize Petitioner or either of the other two males. (*Id.*).

The State then called Dr. Frank Poland, who worked at Plateau Medical Center, and the trial court qualified Dr. Poland as an expert in the field of emergency room medicine. (ECF No. 18-8 at 127–28). Dr. Poland testified that he treated C.C.J. on November 14, 2008, when he presented to the hospital. (*Id.* at 128–29). He testified that C.C.J. was in cardiac arrest when he arrived, and that paramedics had "maxed out atropine," a drug to help the heart contract. (*Id.* at 129). Dr. Poland also testified that he provided epinephrine to C.C.J. in an effort to get his heart contracting. (*Id.* at 130). Dr. Poland testified that while he does not remember drawing blood, based on the medical chart, he drew blood from the left jugular vein. He stated that he generally gives the patient's blood to a nurse who gives it to a laboratory technician, who takes it for immediate testing. (*Id.* at 130–31). Dr. Poland testified that he did not administer

6

oxycodone or any drug of that nature to C.C.J. during the course of this treatment. (ECF No. 18-8 at 134). When asked whether he administered any Valium or other benzodiazepine, he responded affirmatively that he had administered two milligrams of Ativan toward the end of the resuscitation when C.C.J. began to move, after the blood draw, but that he did not administer any such drug prior to the blood draw. (*Id.*). Dr. Poland testified that, according to the chart, C.C.J. was at the hospital for fifty-two minutes and then transferred to Charleston Area Medical Center ("CAMC") in Charleston, West Virginia. (*Id.*).

On cross-examination, Dr. Poland conceded that he could not tell what time C.C.J.'s blood was drawn based on the information in front of him. (*Id.* at 135). After defense trial counsel refreshed Dr. Poland's memory by showing him medical records, he testified that blood was taken twice. A finger stick was done at 10:48 a.m., and vials of blood were drawn at 11:14 a.m. (*Id.* at 136–37). He testified that the purpose of the finger stick was to test for blood sugar, which came back high enough to be problematic in the long run, but not in the short run for a diabetic patient like C.C.J. (*Id.* at 137–38). He also testified that at 10:55 a.m., he gave C.C.J. Romazacon, a drug to counteract benzodiazepine overdose, as a "shotgun" treatment approach because at that time they did not know what was causing C.C.J. to be unconscious and unresponsive. (*Id.* at 139).

On redirect, the Prosecutor asked: "is it true that the blood sample that you took that is shown in these photographs [depicting vials of blood], … was drawn before you-all gave this boy … any drugs[?]" (*Id.* at 142). Dr. Poland replied:

> "Yes and no. We gave him the resuscitative drugs like epinephrine, bicarb, probably the Narcan, Romazacon. And when I gave him the Ativan, that's not a resuscitative drug. That's down the list. I mean, that's to keep him calm so he doesn't wake up and start fighting during transport. But that was after he had responded to the ACLS protocol."

(*Id.*). Dr. Poland reiterated that he did not give C.C.J. oxycodone. (*Id.*).

Next, the State called Virginia Workman, the ED director and nurse manager at Plateau Medical Center. (ECF No. 18-8 at 143-44). Ms. Workman testified that she was present when C.C.J. arrived at the hospital, and he looked cyanotic, meaning, "[h]e was pale, cool, and appeared not to have been breathing for a period of time." (*Id.* at 145). She testified that she was present when blood was taken from C.C.J. and that Dr. Poland and Nurse Tamera Keffer drew the blood through an I.V. access to the jugular vein. (*Id.* at 146). Ms. Workman also testified about meeting Petitioner, who arrived directly after C.C.J. came into the emergency room. (*Id.* at 148). Ms. Workman testified that Petitioner had a very flat affect and that, based on her eighteen years of experience as a nurse, his behavior appeared inappropriate at the time. (*Id.* 148, 150). She testified, "when the father [Petitioner] came in, I was trying to get some questions, and he wasn't answering the questions I was asking." (*Id.* at 149). She testified that she smelled a strong aroma like marijuana while talking with Petitioner, so she asked Petitioner "if anybody was smoking or anything was going on in the house at that time, and he said no." (*Id.* at 149).

On cross-examination, Ms. Workman testified that she was the person entering data while Ms. Keffer was assisting Dr. Poland. (*Id.* at 152). After having her recollection refreshed with medical records, Ms. Workman testified that the blood was collected at 11:14 a.m. (*Id.*). Ms. Workman testified that Romazacon was given at 10:55 a.m. to reverse the effect of a possible overdose and that the medication is used to treat benzodiazepine overdose. (*Id.* at 153).

The State offered three additional medical staff witnesses from Plateau Medical Center: Tamera Keffer, a nurse in the emergency department; Michelle Nottingham, a phlebotomist; and Leslie Tweedie, a laboratory technician. (ECF No. 18-8 at 155–172).

These witnesses testified on direct and cross-examination regarding the chain of custody of the blood drawn from C.C.J. (*Id.*).

Next, the State called Dr. Mona Chebib, a pediatric intensive care doctor at CAMC, who was qualified as an expert witness in pediatrics and pediatric critical care. (*Id.* at 174–76). Dr. Chebib testified that she cared for C.C.J. for his first two and a half days at CAMC before transferring him to the care of another doctor. (*Id.* at 176). Dr. Chebib testified that C.C.J. was admitted to CAMC on the afternoon of Friday, November 14, 2008; he was removed from life support on Tuesday, November 18, 2008 and subsequently died; and his body was transferred thereafter to the M.E.'s Office. (*Id.* at 176–77). Dr. Chebib testified that C.C.J. was nearly brain dead when he arrived at CAMC and required medical life support. (*Id.* at 177). She confirmed that C.C.J. had a history of cystic fibrosis and diabetes, and he was admitted to CAMC with a history of cardiac arrest. (*Id.*) On cross-examination, Dr. Chebib testified that C.C.J. had a urine drug screen that tested positive for benzodiazepine at Plateau Medical Center. (*Id.* at 184). She also testified that she did not recall finding cuts or skin lesions on C.C.J. when he was admitted. She stated that he had very low blood sugar, which could be either the cause or result of cardiac arrest. (*Id.* at 185–87).

Dr. Chebib was followed by prosecution witness, Dr. James Kraner, an employee of the M.E.'s Office, who was recognized by the court as an expert in the field of forensic toxicology. (ECF No. 18-8 at 191–92). Dr. Kraner testified regarding the chain of custody and testing of C.C.J.'s blood samples. (*Id.* at 192–96). He indicated that he found oxycodone in the blood sample taken at Plateau Medical Center, and the concentration of oxycodone was considered a therapeutic or normal prescription level. (*Id.* at 196-97, 200-01, 208). He also testified that he found valium, benzodiazepine, or diazepam in the

Plateau Medical Center's blood sample and in a test of blood drawn four days later at CAMC. (*Id.* at 196, 201–02, 208). He provided information about the speed at which the drugs break down and noted that a patient with cystic fibrosis might metabolize and excrete drugs at a different rate than other patients. (*Id.* at 203–06).

The State then presented Dr. Zia Sabet, the West Virginia Chief Deputy Medical Examiner, who conducted the autopsy of C.C.J. Dr. Sabet was qualified as an expert in forensic pathology. (*Id.* at 220–21). Dr. Sabet testified that he received C.C.J.'s body on November 20, 2008 and performed the autopsy. (ECF No. 18-8 at 222). Dr. Sabet testified that he observed abrasions or scratches on C.C.J.'s back, and the trial court admitted the photograph of C.C.J.'s back showing the abrasions. (*Id.* at 222–23). Dr. Sabet added that the scratches were superficial and partially healed, and that scratching oneself can be a symptom of using an opiate like oxycodone. (*Id.* at 225–26). He confirmed that the M.E.'s Office found oxycodone and diazepam, or Valium, in C.C.J.'s blood at a concentration normally considered therapeutic; however, he noted that these were non-prescribed medications that should not have been in C.C.J.'s system. (*Id.* at 227–28). On direct examination by the State, Dr. Sabet provided the following testimony regarding the cause of death:

> Q:    Doctor, would you explain for us -- in arriving at your cause of death, would you explain to the jury how, if at all, the presence of these controlled substances in this boy's body impacted or affected your ultimate conclusion in this case?

> A:    When you have multi-system organ failure, like the liver cirrhosis, pancreas, cystic fibrosis, lungs, he cannot breathe very well because of the mucous and other pathology findings that I cannot explain it here. And you see on the (unintelligible) examination, this person is defective, means he is -- he cannot resist even normal concentration of drug. Even therapeutic concentration of prescribed drug could affect -- could then metabolize or metabolize this drug from the

system and could effect fatal consequence of this drug, even in normal persons like you and me.

. . . .

Cause of death for this 14-years-old male teenager is combined oxycodone and diazepam intoxication, based on this organ failure, and cystic fibrosis associated with diabetes mellitus, which is what Type I is from the chart that he had, could be contributing factor to his death.

And manner is, because of the not therapeutic concentration of the oxycodone and Valium, and also (unintelligible) of reported caretaker's neglect to provide timely medical rescue, because based on the investigation that we received by the law enforcement, this father a few times rejected to take this teenager to the medical facility and even tried to treat in the tub with the ice or cold water.

These all could be contributing factors to his death. And manner of death is classified as undetermined, because we don't know really if this therapeutic drug concentration -- I'm not hundred percent sure.

(*Id.* at 228–30).

On cross-examination, Dr. Sabet testified that on the day of the autopsy, he initially found the cause of death to be "natural," but that determination was subject to later modification based on additional information. (ECF No. 18-8 at 233). He stated that about a month later, on January 21, 2009, he received the toxicology report, confirming the presence of controlled substances in C.C.J's blood, and advised law enforcement of the results. (*Id.* at 233). He testified further that he did not talk with law enforcement again until May 5, 2009. Then, around May 7, Dr. Sabet received a letter from Lieutenant Detective Jim Sizemore outlining theories of the case the police had developed based on their speaking with lay witnesses. (*Id.* at 235–36). Dr. Sabet acknowledged that his final autopsy report, dated July 28, 2009, was based in part on information provided by Det. Sizemore, and after factoring in that information, Dr. Sabet changed the cause of death from "natural" to "undetermined." (*Id.* at 236–38). Dr. Sabet testified that he could not

11

be sure whether the scratches on C.C.J.'s back were self-inflicted or caused by someone else; however, he felt that it was unlikely the scratches resulted from medical care, transport, or the autopsy. Dr. Sabet also indicated that the medical staff who treated C.C.J. could easily have missed the presence of scratches when treating him. (*Id.* at 239–40). When asked, Dr. Sabet admitted that statements in the autopsy report regarding a possible delay in treatment were based entirely on information provided by Det. Sizemore, and not on physical findings made during the autopsy. (*Id.* at 241). On redirect examination, Dr. Sabet confirmed that the autopsy findings were consistent with the information he received from Det. Sizemore. (*Id.* at 242). He opined that oxycodone, Valium, and cystic fibrosis all contributed in causing C.C.J's death. After Dr. Sabet's testimony, the trial court adjourned for the day.

On the second day of trial, the State began by calling Patricia Paruscio, C.C.J.'s maternal grandmother. (ECF No. 18-9 at 7). Ms. Paruscio testified that C.C.J. lived with her for much of his life, explaining that her daughter, Naomi Ann Griffith, who was C.C.J.'s mother, was addicted to crack cocaine and was incarcerated. (*Id.* at 8). Ms. Paruscio recalled an incident in October 2007 when C.C.J. was living with Petitioner and was found by a neighbor on Petitioner's front porch incoherent and unresponsive; Petitioner was also found inside the house incoherent. (*Id.* at 9–10). Petitioner later told Ms. Paruscio that he had taken Klonopin and had given Klonopin to C.C.J. even though C.C.J. did not have a prescription for the medication. (*Id.* at 11). Ms. Paruscio also provided information about an instance in which C.C.J. was hospitalized in April 2008 for complications related to cystic fibrosis, stating that his father only visited once during the three-week admission. (*Id.* at 16-18). Ms. Paruscio identified certain pieces of physical evidence the State had entered as exhibits, as Jeff Gordon racing memorabilia that

belonged to C.C.J. (*Id.* at 12–15). On cross-examination, defense trial counsel referred to unmarked medical records, asking Ms. Paruscio about a second hospitalization of C.C.J. in April 2008, which was caused by Ms. Griffith providing Ms. Paruscio with an incorrect dosage of medication to give to C.C.J. After Ms. Paruscio denied any recollection of the second hospital visit, the State objected on the ground that the medical records used by defense counsel were not authenticated. The court did not directly rule on the objection, but pointed out that the witness was not aware of a second hospitalization; therefore, defense counsel needed to proceed with another line of questioning. (*Id.* at 25–26).

Next, the State called Naomi Ann Griffith, who was then incarcerated at Lakin Correctional Center for forgery. (ECF No. 18-9 at 28–30). Ms. Griffith testified that she had custody of C.C.J. on and off, and Petitioner sometimes had custody of C.C.J. (*Id.* at 30–31). Ms. Griffith recalled the October 2007 incident, stating that she received a voicemail from her mother telling her to drive to Petitioner's residence because "[C.C.J.] is dying." (*Id.* at 31). Ms. Griffith drove to Petitioner's residence, and he told her that he had given C.C.J. Klonopin, because C.C.J.'s back hurt and he could not sleep. The neighbors later found C.C.J. "passed out on the front porch." (*Id.* at 31–33). Ms. Griffith also testified about C.C.J. being hospitalized in April 2008 due to cystic fibrosis. She stated that C.C.J. was found to have prescription medication in his system that Ms. Griffith remembered to be Valium. (*Id.* at 35). She testified that Petitioner later admitted to her that he had given C.C.J. Valium. (*Id.* at 36). Ms. Griffith also testified that she had three or four phone calls with Petitioner after C.C.J.'s death, between March 4th and March 11th of 2009, which were automatically recorded because she placed the calls from Lakin Correctional Center. (ECF No. 18-9 at 37–38). Ms. Griffith identified a CD containing a recording of the calls and a transcript of the recording. (*Id.* at 37–41). These

were eventually entered as exhibits after the parties debated the necessity of chain of custody testimony. (*Id.* at 52–54).

On cross-examination, Ms. Griffith clarified that C.C.J. was 13 years old at the time of the October 2007 Klonopin incident. (*Id.* at 45). She also testified that C.C.J. frequently had to go to the hospital for cystic fibrosis, but that he hated doing so. (*Id.* at 46–47). Ms. Griffith acknowledged that she used drugs on and off and had been incarcerated for a Community Corrections violation because she tested positive for a controlled substance. (*Id.* at 48, 50–51). Partway through the cross-examination, the trial court admitted as exhibits the CD recordings and transcripts of conversations between Ms. Griffith and Petitioner, which were played for the jury. (ECF No. 18-9 at 54–57, 60). After that was completed, cross-examination resumed and Ms. Griffith testified that she was aware of C.C.J. using marijuana at least once, and she suspected he used marijuana another time. (*Id.* at 65–66). On cross-examination, redirect examination, and recross-examination, Ms. Griffith confirmed that Petitioner was a long-time drug user. (*Id.* at 66–68).

The State then offered Joshua Lee Settle as witness. Mr. Settle testified that he gave three thirty-milligram oxycodone pills to Petitioner on the night of November 14, 2008 in exchange for Jeff Gordon memorabilia. (ECF No. 18-9 at 88–89). He added that he agreed to the deal because Petitioner "bugged" him to make the trade. Mr. Settle recalled that Petitioner arrived at Mr. Settle's residence that night with "two or three people in the car" including C.C.J. (*Id.*). Mr. Settle identified various exhibits of physical evidence, including pictures of Jeff Gordon, a Jeff Gordon calendar, a mug, and matchbox cars, as items that he had received in exchange for the oxycodone pills. (*Id.* at 90–95). On direct and cross-examination, Mr. Settle acknowledged that the Prosecutor promised him that nothing he said would be used against him if he testified. (*Id.* at 97, 99).

14

The State's next witness was Holly Burdette, who testified that she and Petitioner "were good friends." (ECF No. 18-9 at 106–07, 118). Ms. Burdette stated that on the night of November 14, 2008, C.C.J. called her asking for a ride for himself and Petitioner. (*Id.* at 109). Ms. Burdette was drinking with two friends, Marshall Walker and Shaun Stark, and they agreed to drive over in Mr. Walker's car and give C.C.J. a ride. Once they had picked up Petitioner and C.C.J., they all drove to Mr. Settle's house on Route 61, so that Petitioner could obtain thirty-milligram OxyContin pills. (*Id.* at 107–111). At Mr. Settle's residence, Ms. Burdette saw Petitioner get plastic bags out of the car, including one containing a Jeff Gordon calendar, and he took them into Mr. Settle's residence. (*Id.* at 111–12). She testified that when Petitioner returned, he told her he had gotten three thirty-milligram OxyContin pills from Mr. Settle. Petitioner handed one to her, leaving two in a cellophane bag. The group then drove back to Petitioner's residence and dropped off Petitioner and C.C.J. (*Id.* at 113–14). According to Ms. Burdette, she snorted her pill. About twenty or thirty minutes later, C.C.J. telephoned again and asked her to come back. When she arrived, Ms. Burdette saw C.C.J. on the porch, either spitting up mucous or vomiting. (ECF No. 18-9 at 114–15, 118). About an hour later, Ms. Burdette noticed C.C.J. start to scratch himself on his shoulders and back. His eyes were dilated, and he vomited again. C.C.J. advised Ms. Burdette that he had taken a little piece of the OxyContin pill, presumably by mouth, but when she asked Petitioner, he told her that C.C.J. "had 'done' a little bit" which she understood to mean that C.C.J. snorted a part or all of the Oxycontin pill.  Ms. Burdette testified that C.C.J. was laughing and appeared "pretty much fine," but she was concerned about his vomiting. (*Id.* at 116–17). She testified that Petitioner also "looked like he had a buzz, a pretty good buzz from a pill." (*Id.* at 116–18). Ms. Burdette recalled that C.C.J. fell asleep next to his father, but woke up later and vomited again. (*Id.*

15

at 119). Ms. Burdette stated that she and Petitioner stayed up talking until about 5:00 am, and before she went to sleep, she woke up C.C.J. to ask if he felt better, to which he replied "yes." She asked him if he wanted to go to the hospital to which he replied he was "tired of hospitals." (*Id.* at 119–20).

Ms. Burdette testified that she woke up around 9:00 a.m., and Petitioner was already awake, talking on the telephone and smoking a cigarette. (ECF No. 18-9 at 121–22). Ms. Burdette began looking for eye drops in her purse when she heard "[a]n awful noise ... a gargle noise ... gurgling" coming from C.C.J.'s chest. Ms. Burdette asked Petitioner if he had checked on C.C.J., and Petitioner responded that when he woke up two hours earlier, he asked C.C.J. to take his breathing treatment, but C.C.J. refused. Ms. Burdette went over to C.C.J. and touched his leg, which she described as "freezing, and she heard the gurgling sound coming from his chest. (*Id.* at 122). She also testified that at some point after waking up, she checked her purse, which contained a newly filled prescription of 90 Valium pills; however, all but two pills were missing. (*Id.* at 120, 123). Ms. Burdette testified that she subsequently put her head to C.C.J.'s chest and tried to feel for a pulse. When she "felt barely a pulse," she informed Petitioner and Shaun Stark, who had also stayed the night. (*Id.* at 124). Mr. Stark began to perform CPR on C.C.J., and Ms. Burdette told Petitioner to call 911. However, Petitioner was talking on the phone at the time and did not call 911. (*Id.* at 125). Ms. Burdette stated that she, Mr. Stark, and Petitioner began to take C.C.J. to the bathroom to see if he would respond to cold water, but when she felt for his pulse, she believed it had stopped so they took him back to the living room. Ms. Burdette again told Petitioner to call 911, and this time he did. (ECF No. 18-9 at 126–28). Ms. Burdette could not recall on how much time passed between her waking up and the 911 call, but she estimated that it might have been thirty minutes to an

16

hour. (*Id.* at 126–27). She recalled that one paramedic who arrived at the scene was upset, because Petitioner had not communicated the gravity of C.C.J.'s condition when he called 911. She testified that, about a week after C.C.J.'s death, Petitioner told her "he had shot [C.C.J.] up with an OxyContin 30." (*Id.* at 131–32).

For its final witness, the State called Det. Jim Sizemore, a police lieutenant with about 26 years of law enforcement experience, who was Chief of Detectives at the Fayette County Sheriff's Office. (ECF No. 18-9 at 151). Det. Sizemore testified extensively about his investigation and the evidence collected, touching on all areas of the case and referring to evidence discussed in other witnesses' testimony. (*Id.* at 151–79). Of particular relevance to the habeas petition are two areas of testimony. First, on direct examination, Det. Sizemore testified that he reviewed medical records showing what prescription drugs C.C.J. had in his bloodstream, and that C.C.J. was not prescribed these drugs. (*Id.* at 152–54). Second, on cross-examination, Det. Sizemore discussed a police report he wrote, and a letter he wrote to M.E. Sabet, both of which stated that it was unlikely that law enforcement could prove that Petitioner had given the drugs to C.C.J. absent a truthful statement from Petitioner. (*Id.* at 163–65, 172–75). On redirect examination, Det. Sizemore discussed the lack of direct evidence of oxycodone delivery and the available circumstantial evidence. (ECF No. 18-9 at 176–77). He indicated that the while there were some minor inconsistences among the statements of various witnesses and the phone conversations between Petitioner and Ms. Griffith, they were consistent on the major issues. (*Id.*).

After Det. Sizemore's testimony, the State rested its case. (*Id.* at 179). Petitioner moved for judgment of acquittal, again raising arguments brought up in its pretrial Motion to Elect, and arguing that the evidence was insufficient to support any of the

counts. (*Id.* at 180–88). Petitioner also requested that, to the extent that acquittal was not granted, Count 4 of the original indictment, which was dismissed, be included as a lesser-included offense under Count 3. (*Id.* at 188). The parties both argued the evidence and West Virginia legal precedent regarding the causation standard for felony murder with the underlying felony of delivering a controlled substance. (*Id.* at 188–97). The trial court denied the motion for judgment of acquittal while noting some reservation about whether Petitioner could be convicted of both Counts 1 and 3. (*Id.* at 197–98).

For its first witness, the defense called Shaun Christopher Stark, who testified that he was familiar with Holly Burdette. (ECF No. 18-9 at 200–01). He testified that on November 14, 2008 he and Marshall Walker were hanging out and drinking a little and they drove to Ms. Burdette's apartment. (*Id.* at 202). Ms. Burdette told them she wanted to give someone a ride, so they went to pick up C.C.J. and Petitioner at Mountainair Trailer Court. (*Id.* at 203). He testified that they drove to a residence "[s]omewhere down 61" and stopped there for about ten minutes, then returned to Mountainair Trailer Court and dropped off C.C.J. and Petitioner. (*Id.* at 203–04). Mr. Stark testified that the rest of them left, but he and Ms. Burdette later walked back to Mountainair Trailer Court, and they slept at Petitioner's residence. (*Id.* at 204–06). He recalled that he woke up for about five minutes and observed C.C.J. throwing up into a bag that Ms. Burdette was holding for him. (ECF No. 18-9 at 206–07). When Mr. Stark awoke the next morning, Ms. Burdette was "hollering" at C.C.J. to try to wake him up and Petitioner was on the phone. (*Id.* at 207–08). Mr. Stark stated that someone splashed water on C.C.J. and that, after listening to C.C.J.'s chest, Mr. Stark could not hear a heartbeat so he began CPR, pumping C.C.J.'s chest and blowing air into his mouth. (*Id.* at 208). Mr. Stark believed about ten or fifteen minutes passed between the time when he awoke and arrival of the ambulance.

18

(*Id.* at 209). He also testified that his friend, Mr. Walker, returned to pick him up and saw him performing CPR. After the ambulance took C.C.J., Mr. Stark and Mr. Walker drove Ms. Burdette to the hospital. (*Id.* at 209–10).

For its second witness, the defense called Marshall Walker, who stated that he had known Ms. Burdette for "a couple of years." (ECF No. 18-9 at 212). He testified that he and Mr. Stark picked up Ms. Burdette and drove down Route 61, then returned to Mountainair Trailer Court. He could not remember whether C.C.J. and Petitioner went with them, as he had been drinking and his memory was fuzzy. (*Id.* at 212–15). Mr. Walker testified that he returned to Petitioner's house the next morning to pick up Mr. Stark, and everyone was asleep when he arrived. (*Id.* at 216). Mr. Walker testified that he woke up Mr. Stark, and Mr. Stark woke up Ms. Burdette to tell her he was leaving. Mr. Walker recalled hearing "some noise." (*Id.* at 216–17). He saw Petitioner trying to wake up C.C.J. Mr. Stark checked C.C.J's pulse, but could not find a pulse. Accordingly, Mr. Stark took C.C.J. to the bathroom and splashed cold water on him, then brought him back to the living room and started performing CPR. Petitioner was told to call an ambulance. (*Id.* at 217). Mr. Walker testified that it was about thirty minutes after people woke up when they started providing CPR to C.C.J., and about thirty minutes or an hour elapsed between the time Mr. Walker arrived at the house and when the ambulance arrived. (ECF No. 18-9 at 217–18). On cross-examination, the State showed Mr. Walker a transcript of a statement he gave to police several days before the trial in which he stated "When I got there, they was trying to wake [C.C.J.] up" and Mr. Walker acknowledged that statement was different from the testimony he had just given. (*Id.* at 220–21).

For its final witness, the defense called Violent Marie Flint, Petitioner's mother and C.C.J.'s paternal grandmother. (*Id.* at 223). Ms. Flint testified on a variety of topics, none

of which are particularly relevant to the habeas petition. (*Id.* at 221–252). After Ms. Flint's testimony, the trial court adjourned for the day. (*Id.* at 259).

The next morning, Petitioner elected not to testify and the defense rested its case. (ECF No. 18-10 at 6–8). Petitioner renewed his motion for judgment of acquittal. (*Id.* at 10). The trial court heard additional argument on the elements of the charged crimes and the evidence and denied the renewed motion. (*Id.* at 10–20). The parties and the trial court then worked to develop the jury instructions and a jury verdict form. (*Id.* at 21–41). The trial court determined that each side would have forty-five minutes for closing arguments, and the State would split its time between an initial closing and rebuttal closing argument. (*Id.* at 42–44). The trial court called in the jury and provided jury instructions. (*Id.* at 46–70). The State made its initial closing argument (*Id.* at 72–88), the defense made its closing argument, (*Id.* at 88–104), and the State made its rebuttal closing argument. (*Id.* at 104–113). During jury deliberations, the jury passed a note to the trial court asking: "'Does the felony that was committed have to cause' -- 'cause' underlined -- 'the death or contribute' -- and 'contribute' underlined -- 'to it?'" (ECF No. 18-10 at 117). After hearing arguments from the parties, the trial court declined to further instruct the jury. (*Id.* at 117–22). The jury concluded deliberations and returned a verdict of guilty with a recommendation of mercy with regard to Count 1, felony murder, and guilty with regard to child neglect resulting in death, the lessor included offense under Count 3. (*Id.* at 125–26).

On June 28, 2010, the trial court sentenced Petitioner to life with mercy on Count 1, the felony murder count, and to three to fifteen years on child neglect resulting in death, the lesser-included offense of Count 3. (ECF No. 18-13 at 3). The trial court ordered that the two sentences be served consecutively. (*Id.* at 4). On October 18, 2010, the trial court

issued an Agreed Resentencing Order at Petitioner's request for the purpose of perfecting an appeal. (ECF No. 18-14).

### B. Direct appeal to the Supreme Court of Appeals of West Virginia ("WVSCA")

On July 16, 2010, Petitioner, acting *pro se*, filed a Notice of Intent to Appeal. (ECF No. 18-27 at 9). Through counsel, Petitioner filed a second Notice of Intent to Appeal on July 27, 2010. (*Id.*). Due to a delay in preparing the trial transcripts, the trial court entered an Agreed Resentencing Order on October 28, 2010. (ECF No. 18-14). On February 28, 2011, Petitioner's counsel filed a petition for appeal with the WVSCA. (ECF Nos. 18-15 & 18-18). Petitioner raised five issues on appeal:

1. Trial court error in allowing the State to proceed against him for the offenses of felony murder, death of a child by a parent, and child neglect resulting in death, where all three offenses were based on delivering to C.C.J. or permitting C.C.J. to use oxycodone.

2. Insufficiency of the evidence to prove that delivery of the oxycodone itself caused C.C.J.'s death; insufficiency of the evidence to prove that Petitioner delivered either oxycodone or valium to C.C.J.; and improper jury instructions on causation.

3. Trial court error in suppressing Petitioner's statement to law enforcement only for the purpose of the State's case in chief.

4. Trial court error in admitting immaterial and gruesome autopsy photographs of C.C.J.'s body.

5. Trial court error in permitting use of 404(b) evidence regarding past incidents of C.C.J. obtaining controlled substances with Petitioner's knowledge and

21

cooperation.

(*Id.*). On June 21, 2012, the WVSCA affirmed the conviction in a thirty-six page *per curiam* opinion. (ECF No. 18-18 at 11).

### C. Rule 35 Motion for Reduction of Sentence

On August 20, 2012, the state circuit court received Petitioner's *pro se* Motion for Reduction of Sentence with the state circuit court requesting a modification either reducing his consecutive sentences to concurrent sentences or to suspended sentences. (ECF No. 18-20). On August 30, 2012, the state circuit court issued an opinion denying the motion. (ECF No. 18-21).

### D. State Habeas Proceedings

Petitioner filed a *pro se* Petition for Writ of Habeas Corpus in state circuit court in Fayette County on August 30, 2012. (ECF No. 18-22). On September 11, 2012, the circuit court appointed habeas counsel and directed habeas counsel to file an amended petition. (ECF No. 18-27 at 10). On April 26, 2013, Petitioner filed the following list of twenty-nine alleged grounds he intended to assert at his habeas proceeding:

1) Statute under which conviction obtained unconstitutional;

2) Indictment shows on face no offense was committed;

3) Prejudicial pre-trial publicity;

4) Denial of counsel;

5) Consecutive sentences for same transaction;

6) Coerced confessions;

7) Suppression of helpful evidence by prosecutor;

8) State's knowing use of perjured testimony;

9) Information in pre-sentence report erroneous;

10) Ineffective assistance of counsel;

11) Double jeopardy;

12) Irregularities in arrest;

13) Challenges to the composition of grand jury or its procedures;

14) Defects in indictment;

15) Improper venue;

16) Refusal to subpoena witnesses;

17) Non-disclosure of Grand Jury minutes;

18) Refusal to turn over witness notes opposed to time of trial;

19) Claims concerning use of informers to convict;

20) Constitutional errors in evidentiary rulings;

21) Instructions to the jury

22) Claims of prejudicial statements by prosecutor;

23) Sufficiency of evidence;

24) Severer sentence than expected;

25) Excessive sentence;

26) Ex Post Facto Law;

27) Refusal to allow lesser included offense;

28) Cumulative effect of numerous errors;

29) Newly discovered evidence.

(ECF Nos. 18-25 at 5–9 & 18-27 at 10–11). Through counsel, Petitioner filed an Amended Petition on February 14, 2014, which incorporated the twenty-nine claims into twelve contentions:

1) Defects in the indictment and jury instructions;

2) The Court improperly instructed the jury;

3) Petitioner was denied his constitutional right to effective counsel when trial counsel made the following errors;

    1.  Telling the jury there was proof of delivery.

    2.  Failure to object to lay witness' opinion on legal weight of evidence.

    3.  Failure to object to inappropriate prejudicial comments of the prosecution.

    4.  Failure to disclose or call any expert witnesses.

    5.  Failure to object to extensive leading questions.

    6.  Failure to object to substantive testimony over exhibits marked for identification only.

    7.  Failure to object and seek curative instruction over lay witnesses testifying as experts.

    8.  Failing to object and seek curative instruction over inappropriate bolstering of other witnesses' credibility.

    9.  Failure to have authenticating witness.

    10. Failing to establish when blood was drawn.

4) The Petitioner was unfairly prejudiced by statements of the Prosecutor;

5) Petitioner asserts that he was subjected to multiple punishments for the same criminal actions violating double jeopardy principles;

6) Petitioner incurred prejudicial pre-trial publicity;

7) Petitioner was subject to irregularities in his arrest;

8) Petitioner's trial counsel refused to subpoena witnesses necessary for his trial;

9) Constitutional errors in evidentiary rulings;

10) The evidence was insufficient;

24

11) Petitioner's rights were violated for refusal to allow the lesser included offense of voluntary manslaughter; and

12) Petitioner was entitled to a new trial due to the cumulative effect of all the aforementioned errors and violations of his rights.

(ECF Nos. 18-23 & 18-27 at 11–12). The state circuit court held an omnibus evidentiary hearing on May 5, 2014 and a second hearing on May 14, 2014. (ECF Nos. 18-25 & 18-26). The parties submitted proposed findings of fact and conclusions of law. (ECF No. 18-27 at 1). On February 19, 2015, the state circuit court entered a ninety-four page order, dated February 18, 2015, denying the Petitioner's state court habeas petition. (ECF No. 18-27).

Petitioner subsequently appealed to the WVSCA arguing that the state circuit court erred by denying his claim of ineffective assistance of counsel. (ECF Nos. 18-29 & 18-30). The WVSCA considered the parties' briefs and the record and determined that no oral argument would be necessary. (ECF No. 18-33). The WVSCA stated that the state circuit court's ninety-four page order included well-reasoned findings and conclusions, and the WVSCA found that there was no substantial question of law and no prejudicial error. (*Id.*). The WVSCA affirmed the state circuit court's decision in a short unanimous memorandum decision issued April 12, 2016. (*Id.*). On May 13, 2016, the WVSCA issued a mandate order stating that its memorandum decision was final. (ECF No. 18-34).

### E. Federal Habeas Petition

Petitioner filed the instant § 2254 petition on July 28, 2016. (ECF No. 2). Therein, Petitioner asserts the following grounds for relief:

1.   Incorrect Causation Standard and Insufficiency of the Evidence;

2.   Double Jeopardy;

3.   Ineffective Assistance of Counsel;

    a. Telling the jury during opening statement that there was proof of delivery of oxycodone;

    b. Failing to object to lay witness opinion on the legal weight of evidence;

    c. Failing to object to inappropriate prejudicial remarks by the Prosecutor;

    d. Failing to call or disclose any expert witness;

    e. Failing to object to leading questions;

    f. Failing to object to substantive testimony regarding exhibits marked for identification only;

    g. Failing to object to or seek a curative instruction for lay witnesses testifying as experts;

    h. Failing to object and seek curative instruction regarding the medical examiner witness improperly bolstering the credibility of the investigating officer witness;

    i. Failing to call witnesses to authenticate hospital records regarding prior treatment and hospitalization of C.C.J.;

    j. Failing to establish the timeline of when blood was drawn from C.C.J. to test for toxicology; and

  4. Prosecutorial misconduct.

 (ECF No. 2 at 6–18).

On August 10, 2016, the undersigned ordered Respondent to respond to the Petition by November 4, 2016. (ECF No. 8). However, Respondent failed to respond within that time frame. (ECF No. 16). Respondent asserts that, for unknown reasons, the

Appellate Division of the West Virginia Attorney General's Office did not receive the August 10, 2016 Order. (ECF No. 20). In October and November of 2016, Petitioner corresponded with the Clerk of the Court regarding requests for copies of documents in this matter. (ECF No. 9–14). On December 8, 2016, Petitioner filed a Motion for Summary Judgment based on Respondent's failure to answer or request for an extension of time to answer the Petition, and failure to show cause as to why the Petition should not be granted. (ECF No. 15). On December 9, 2016, the undersigned ordered Respondent to respond to the Petition and to the Motion for Summary Judgment. (ECF No. 16).

On December 30, 2016, Respondent filed on CM/ECF a Motion for Summary Judgment with thirty-four exhibits, (ECF No. 18), a supporting Memorandum of Law with accompanying Motion to Exceed the Page Limitation, (ECF Nos. 19 & 20), Rule 5 disclosures, (ECF No. 21), and a Response to Petitioner's Motion for Summary Judgment (ECF No. 22). In Respondent's Motion for Summary Judgment and supporting Memorandum of Law, Respondent contends that Petitioner is not entitled to habeas relief because the state circuit court's decision regarding Petitioner's claims, which was affirmed by the WVSCA, was not contrary to or an unreasonable application of clearly established federal law. (ECF Nos. 18 & 20).

On January 9, 2017, Petitioner filed a Renewed Motion for Summary Judgment, asserting that he received Respondent's motion and appendix of exhibits through the facility's legal mail, but that he was not served with Respondent's thirty-four exhibits or the supporting Memorandum of Law. (ECF No. 25). On January 10, 2017, counsel for Respondent asserted that it had mailed those documents to Petitioner, but that it was mailing a second copy as well. (ECF No. 26). On January 11, 2017, Petitioner filed a first Objection to Respondent's Motion for Summary Judgment, objecting on the ground that

Petitioner had not received the referenced exhibits or memorandum of law. (ECF No. 27). On January 12, 2017, Respondent filed a Reply to Petitioner's first Objection to Respondent's Motion for Summary Judgment arguing that Petitioner had failed to rebut Respondent's Motion for Summary Judgment. (ECF No. 28).

On January 23, 2017, Petitioner filed a letter-form notice that he had received all of Respondent's filings as of January 17, 2017. (ECF No. 30). On February 8, 2017, Petitioner filed a substantive second Objection to Respondent's Motion for Summary Judgment, (ECF No. 33), together with a Motion to Exceed the Page Limitation (ECF No. 32). In that Objection, Petitioner also requested a finding in his favor on his Petition, or in the alternative, an evidentiary hearing on the Petition with an appointment of counsel. (ECF No. 33). On February 22, 2017, the State filed Respondent's Reply. (ECF No. 35). The matter is thus ripe for review.

## II.   <u>Standard of Review</u>

Title 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, authorizes a federal district court to entertain a petition for habeas corpus relief from a prisoner in State custody, "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). When determining the merits of a § 2254 petition, the district court applies the standard set forth in § 2254(d), which provides that the habeas petition of a person in State custody "shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim" is:

> (1) contrary to, or involves an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) based on an unreasonable determination of the facts in light of the
evidence presented in the state court proceeding.

28 U.S.C. § 2254(d)(1)–(2). Moreover, the factual determinations made by the state court
are presumed to be correct and are only rebutted upon presentation of clear and
convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1). Thus, when reviewing a
petition for habeas relief, the federal court uses a "highly deferential lens." *DeCastro v.
Branker*, 642 F.3d 442, 449 (4th Cir. 2011).

A claim is generally considered to have been "adjudicated on the merits" when it is
"substantively reviewed and finally determined as evidenced by the state court's issuance
of a formal judgment or decree." *Thomas v. Davis*, 192 F.3d 445, 455 (4th Cir. 1999). The
"contrary to" and "unreasonable application" clauses of § 2254(d)(1) have separate and
independent meanings. *Williams v. Taylor*, 529 U.S. 362, 405, 120 S. Ct. 1495, 146
L.Ed.2d 389 (2000). A state court decision warrants habeas relief under the "contrary to"
clause "if the state court arrives at a conclusion opposite to that reached by the Supreme
Court on a question of law or confronts facts that are materially indistinguishable from a
relevant Supreme Court precedent and arrives at a result opposite to the Supreme
Court's." *Lewis v. Wheeler*, 609 F.3d 291, 300 (4th Cir. 2010) (quoting *Williams*, 529 U.S.
at 405) (internal quotations omitted). The district court may grant a habeas writ under
the "unreasonable application" clause if the state court "identifies the correct governing
legal rule from the [Supreme] Court's cases but unreasonably applies it to the facts of the
particular case." *Id.* at 300–01 (internal marks omitted).

Accordingly, the AEDPA limits the federal habeas court's scope of review to the
reasonableness, rather than the correctness, of the state court's decision. A federal court
may not issue a writ under this standard "simply because that court concludes in its

29

independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather the application must also be unreasonable." *Williams*, 529 U.S. at 365.

Here, both Petitioner and Respondent have moved for summary judgment. (ECF Nos. 15; 18; & 25). Summary judgment under Rule 56 of the Federal Rules of Civil Procedure "applies to habeas proceedings." *Brandt v. Gooding*, 636 F.3d 124, 132 (4th Cir. 2011) (quoting *Maynard v. Dixon*, 943 F.2d 407, 412 (4th Cir. 1991)). The court will grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] fact or facts are material if they constitute a legal defense, or if their existence or nonexistence might affect the result of the action, or if the resolution of the issue they raise is so essential that the party against whom it is decided cannot prevail." Charles Alan Wright, Arthur R. Miller &, Mary Kay Kane, *Federal Practice and Procedure*: *Civil* § 2725 (3d ed. 2005). On the other hand, a fact is not material when it is of no consequence to the outcome, or is irrelevant in light of the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Assertions of material facts must be supported by "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c). In addition, only genuine disputes over material facts "will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248; *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). A dispute is "genuine" when "there is sufficient evidence on which a reasonable jury could return a verdict in favor of the non-moving party." *Cox v. Cty. of Prince William*, 249 F.3d 295,

299 (4th Cir. 2001) (citing *Anderson*, 477 U.S. at 248).

Motions for summary judgment impose a heavy burden on the moving party, as it must be obvious that no material facts are in dispute and no rational trier of fact could find for the nonmoving party. *See Miller v. F.D.I.C.*, 906 F.2d 972, 974 (4th Cir. 1990). Nonetheless, the "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent entry of summary judgment. *Anderson,* 477 U.S. at 252. While any permissible inferences to be drawn from the underlying facts "must be viewed in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986), "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Anderson*, 477 U.S. at 249–50).

## III.    <u>Discussion</u>

### A. Petitioner's Motion for Summary Judgment and Renewed Motion for Summary Judgment Regarding Respondent's Compliance with Court Orders.

On December 8, 2016, Petitioner filed a Motion for Summary Judgment based upon Respondent's failure to timely answer the Petition for a Writ of Habeas Corpus. (ECF No. 15). In opposition, Respondent argues that Petitioner's Motion should be denied for three reasons. (ECF No. 22). First, Respondent contends that his response was not untimely, because he did not have actual notice of the November 4, 2016 deadline. Respondent represents that for unknown reasons counsel did not receive the August 10, 2016 Order, which set the response deadline of November 4, 2016, and therefore Respondent never received notice of the deadline. Second, Respondent asserts that Petitioner's motion, while styled as a Motion for Summary Judgment, essentially asks for a default judgment. Respondent argues that default judgments are not available in habeas

proceedings. Third, Respondent argues that Petitioner's Petition lacks merit and, thus, he

has not established his right to relief by meeting his burden under the United States

Code,[2] which provides in relevant part:

> (d) An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be granted with
> respect to any claim that was adjudicated on the merits in State court
> proceedings unless the adjudication of the claim--
>
>> (1) resulted in a decision that was contrary to, or involved an
>> unreasonable application of, clearly established Federal law, as
>> determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable
>> determination of the facts in light of the evidence presented in the State
>> court proceeding.

28 U.S.C. § 2254(d). Respondent claims that, even though he missed the original filing

deadline, the Motion for Summary Judgment and supporting Memorandum of Law that

Respondent filed with his Response demonstrate that Petitioner cannot meet his burden

under 28 U.S.C. § 2254(d)(1) or (d)(2).

Petitioner demands judgment because Respondent failed to contest the habeas

petition within the proper time frame. Accordingly, the undersigned agrees that

Petitioner seeks the equivalent of a default judgment. *See* Fed. R. Civ. P. 55 (providing

procedure for obtaining entry of default and default judgment when party against whom

judgment is sought has failed to plead or otherwise defend against action). The law is well

settled that resolving a habeas corpus petition on the ground of "default" is disfavored

---

[2] Respondent also analogizes to language in Federal Rule of Civil Procedure 55(d), which provides that "[a]
default judgment may be entered against the United States, its officers, or its agencies only if the claimant
establishes a claim or right to relief by evidence that satisfies the court." Fed. R. Civ. P. 55(d). Respondent
argues that even though Respondent is not the United States, but a warden of a West Virginia correctional
facility, the underlying rationale should be the same.

and generally inappropriate. *See Gordon v. Duran,* 895 F.2d 610, 612 (9th Cir.1990) ("The failure to respond to claims raised in a petition for habeas corpus does not entitle the petitioner to a default judgment."); *Aziz v. Leferve,* 830 F.2d 184, 187 (11th Cir.1987) ("[D]efault judgment is not contemplated in habeas corpus cases."); *Bermudez v. Reid,* 733 F.2d 18, 21 (2d Cir.1984) (recognizing that default judgment in habeas proceedings is different than default judgment in other civil cases because, without reaching merits of habeas claims, "it would not be the defaulting party but the public at large that would be made to suffer" the consequences of granting prisoner default judgment); *United States ex rel. Mattox v. Scott,* 507 F.2d 919, 924 (7th Cir.1974) (recognizing burden of granting default judgment in habeas case to petitioner "fall[s] upon the community at large"); *Allen v. Perini,* 424 F.2d 134, 138 (6th Cir.1970) (holding default judgment does not apply to habeas corpus cases); *Whitlow v. Ballard*, No. CV 15-12744, 2017 WL 971044, at *1 (S.D. W. Va. Mar. 13, 2017) (adopting report and recommendation wherein magistrate judge recommended denying petitioner's motion for summary judgment based on respondent's failure to timely respond to petition); *Guerra v. Atkinson,* No. 4:13–2062, 2014 WL 1400808, at *1, *7–*8 (D.S.C. Apr. 10, 2014) (same); *Mykolaitis v. Howes,* No. 2:10–cv–11903, 2011 WL 3624949, at *26 (E.D. Mich. June 28, 2011) (report and recommendation recommending that petitioner's motion for summary judgment based on respondent's failure to timely respond be denied because, in part, petitioner essentially sought default judgment, which was unavailable in habeas corpus context); *United States v. Smith,* No. 1:05–cv–0175, 2007 WL 5161771, at *4–*5 (S.D. W. Va. July 25, 2007) (recognizing that "courts are reluctant to award default judgment in the habeas setting" and denying petitioner's motion for default judgment). Consequently, Petitioner's Motion for Summary Judgment should be denied.

Respondent also argues that Petitioner's Renewed Motion for Summary Judgment, (ECF No. 25), should be denied. Respondent provided an affidavit signed by an administrative assistant asserting that the assistant prepared for mailing and mailed a complete copy of the filing to Petitioner at his address of record, Mount Olive Correctional Complex. (ECF No. 26-1). Respondent also stated that it would mail a second copy of the documents to Petitioner. (ECF No. 26). While it is not clear why Petitioner received only a partial copy of Respondent's December 30, 2016 filings when a complete copy was filed on CM/ECF that day, Petitioner received the missing documents no later than January 17, 2017. Therefore, Petitioner was not prejudiced, and he fails to a potentially meritorious ground for relief

Therefore, the undersigned **RECOMMENDS** that the presiding District Judge **DENY** Petitioner's Motion for Summary Judgment and Renewed Motion for Summary Judgment.

### B. Petitioner's Petition for Writ of Habeas Corpus and Respondent's Motion for Summary Judgment.

Petitioner filed the instant § 2254 petition on July 28, 2016. (ECF No. 2). Therein, Petitioner asserts the four overarching grounds for relief: (1) improper legal causation standard/insufficiency of the evidence (2), double jeopardy or multiplicity of charges, (3) ineffective assistance of counsel, and (4) prosecutorial misconduct. The undersigned discusses each ground separately below.

### 1. Causation Standard and Sufficiency of the Evidence

In his first ground for relief, Petitioner contends that there was insufficient evidence to find that oxycodone was the "but-for cause" of C.C.J.'s death, and thus Petitioner should not have been convicted of felony murder with the underlying offense

being delivery of oxycodone. (ECF No. 2 at 6–7). In Petitioner' Objection to Respondent's Motion for Summary Judgment, Petitioner clarifies that he is making two arguments. (ECF No. 33 at 7–14). First, Petitioner makes a *corpus delicti* argument about the proper causation standard under West Virginia's felony murder statute. (*Id.*). Petitioner argues that the trial court erred in ruling that the statute required only that oxycodone "contribute to" C.C.J.'s death rather than that oxycodone be the "but-for cause" of C.C.J.'s death. (*Id.*). Thus, under Petitioner's theory of the felony murder statute, even if the State could prove that Petitioner had feloniously delivered oxycodone to C.C.J., and that oxycodone contributed to C.C.J.'s death, Petitioner would still be innocent of felony murder. Second, Petitioner argues that there is insufficient evidence to show that oxycodone was the but-for cause of C.C.J.'s death. (*Id.*).

### a. Causation Standard

The Supreme Court "ha[s] stated many times that 'federal habeas corpus relief does not lie for errors of state law.'" *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (quoting *Estelle v. McGuire*, 502 U.S. 62, 67 (1991)). Thus, "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle*, 502 U.S. at 67–68 (1991).

With regard to the causation standard, Petitioner argues that the state court decision interpreting West Virginia's felony murder statute is contrary to the United States Supreme Court's decision in *Burrage v. United States*, 134 S. Ct. 881 (2014). Petitioner argues that *Burrage* involves a federal statute, U.S.C. § 841(b)(1)(C), that is similar to the state statute, W. Va. Code § 61-2-1, in Petitioner's case. (ECF No. 33 at 12). Petitioner argues that the *Burrage* Court determined that a defendant charged with delivery of heroin causing death could only be convicted under the federal statute if the

evidence showed that heroin was the but-for cause of the victim's death. (ECF No. 33 at 12).

However, *Burrage* is not controlling here because, as Petitioner acknowledges, it does not interpret the relevant West Virginia statute. Instead, *Burrage* interpreted a provision in the federal Controlled Substances Act providing for a penalty enhancement where death or serious bodily injury results from the delivery of a controlled substance. *Burrage*, 134 S. Ct. at 885. While the Supreme Court's interpretation of language in a federal statute may or may not be persuasive to state courts considering a state statute, the Supreme Court's interpretation is not binding on the state courts. Here, West Virginia state courts made a determination about the meaning of a West Virginia state statute, W. Va. Code § 61-2-1. Thus, Petitioner does not raise an issue of clearly established federal law on which a federal habeas court can grant relief. *See Swarthout*, 562 U.S. at 219 (quoting *Estelle*, 502 U.S. at 67) ("federal habeas corpus relief does not lie for errors of state law.")

In this case, the record shows that the trial court considered extensive argument on the proper causation standard and the facts supporting causation. For example, at the close of the State's argument, the trial court heard argument on causation and declined to grant Petitioner's motion for a judgment of acquittal on the felony murder count. (ECF No. 18-9 at 185–97). At the close of Petitioner's case-in-chief, Petitioner again requested judgment of acquittal, the trial court heard argument on the causation standard, and the trial court denied Petitioner's motion. (ECF No. 18-10 at 10–20). In its instructions to the jury on the felony murder standard, the trial court did not use the terms "contribute," "cause," or "but-for." Instead, the trial court instructed the jury that it could find Petitioner guilty of felony murder "as a result of the death of [C.C.J.] *occurring during*

36

the commission of the felony crime of delivery of oxycodone" if the State proved that Petitioner "did deliver oxycodone . . . to [C.C.J.] and that [C.C.J.] died *as a result of* [Petitioner] committing the crime of delivery of a controlled substance." (ECF No. 18-10 at 56–57) (emphasis added). During deliberations, the jury sent a note to the trial court, asking whether the felony underlying the felony murder charge had to *cause* the death or *contribute* to it. (ECF No. 18-10 at 117). The trial court heard argument from the parties and noted that both sides had muddled the issue during closing arguments because the State referred to a "contribute" standard and Petitioner's counsel referred to a "cause" standard. (ECF No. 18-10 at 117). The trial court, with the agreement of counsel for both the State and Petitioner, declined to further instruct the jury on this point. (*Id.* at 117–22).

On direct appeal, the WVSCA engaged in an extensive analysis of the causation standard and found that the state circuit court did not err. (ECF No. 18-18 at 20–29). After devoting nine pages to reviewing the statute and precedent, the WVSCA stated:

> Taking all of these prior decisions into consideration, we conclude in order to obtain a conviction for felony murder, all that the State was required to prove was that the death was simply *a result of* the delivery of the oxycodone. Nothing in our prior jurisprudence leads us to conclude that the State was required to prove that the delivery of the oxycodone was the sole cause of C.C.J.'s death. Thus, we cannot say that the circuit court erred in determining that the evidence was sufficient to prove that C.C.J.'s death was the result of the delivery of the oxycodone by Petitioner.

(*Id.* at 29).

Therefore, the undersigned **FINDS** that the state court's decision with regard to the causation standard is not contrary to, or an unreasonable application of, clearly established federal law and **RECOMMENDS** that Respondent's motion for summary judgment be **GRANTED** on this portion of Petitioner's ground for relief No. 1, and that

Petitioner's request for habeas relief on this issue be **DENIED**.

### b. *Sufficiency of the Evidence*

"[T]he Due Process Clause of the Fourteenth Amendment protects a defendant in a [state] criminal case against conviction 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.'" *Jackson v. Virginia*, 443 U.S. at 315 (quoting *In re Winship*, 397 U.S. 358, 364 (1970)). "To determine whether this due process right has been violated, the appropriate inquiry before the passage of AEDPA was a straightforward question of whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Now, under the AEDPA ... we inquire whether a state court determination that the evidence was sufficient to support a conviction was an objectively unreasonable application of [the standard enunciated in] *Jackson*." *Williams v. Ozmint*, 494 F.3d 478, 489 (4th Cir. 2007) (internal citations and quotations omitted).

With regard to the sufficiency of the evidence argument, Petitioner contends that there was not sufficient evidence to prove beyond a reasonable doubt that the oxycodone allegedly delivered to C.C.J. was the but-for cause of C.C.J.'s death. (ECF No. 2 at 6). Specifically, Petitioner points to testimony that the medical examiner was "not [one] hundred per cent sure" of the cause of death, that the cause of death was "undetermined"; that the presence of Valium, or benzodiazepine, could also have contributed to the death; and that there was no evidence of Petitioner having delivered Valium to C.C.J. (*Id.*).

After considering the standard provided in *Jackson*, the undersigned concludes that Petitioner's insufficiency of the evidence claim lacks merit. As discussed above, the trial court and WVSCA determined that the State was only required to prove that C.C.J.'s

death occurred as a result of the delivery; the State was not required to prove that delivery was the sole cause or "but-for" cause of death. *Supra* Section III.B.1.a. In considering Petitioner's motions for acquittal on the felony murder charge, the trial court considered the presented evidence and determined that there was sufficient evidence for the jury to find Petitioner guilty. (ECF Nos. 18-9 at 197 & 18-10 at 19–20). The WVSCA agreed that the evidence was sufficient. (ECF No. 18-18 at 29). The WVSCA quoted the following portion of the July 28, 2009 Report of Death Investigation and Post-Mortem Examination Findings by Drs. Sabet and Kaplan: "It is our opinion that [C.C.J.], a 14-year-old male teenager, died *as the result of combined oxycodone and diazepam intoxication* resulting in fatal hypoxic encephalopathy following a 5-day hospitalization, without documented prescription access to oxycodone and diazepam. Cystic Fibrosis and insulin dependent diabetes mellitus are potentially contributory conditions." (*Id.*). With respect to the level of oxycodone found in C.C.J.'s blood, Dr. Sabet testified that a patient like C.C.J. with cystic fibrosis might not be able to metabolize a drug dose that would normally be considered therapeutic. (ECF No. 18-8 at 228–29). The undersigned agrees that this evidence could support a reasonable jury's finding that C.C.J. died as a result of oxycodone intoxication. Additionally, even under the but-for standard Petitioner advocates, the undersigned finds that the jury could reasonably have determined that C.C.J. would not have died but for the oxycodone in his system given of the testimony that C.C.J.'s cystic fibrosis could have prevented him from metabolizing a therapeutic dose of oxycodone.

Therefore, the undersigned **FINDS** that the state court's decision with regard to sufficiency of the evidence is not contrary to, or an unreasonable application of, clearly established federal law. Thus, the undersigned **RECOMMENDS** that Respondent's

motion for summary judgment be **GRANTED** on this portion of Petitioner's ground for relief No. 1, and that Petitioner's request for habeas relief on this issue be **DENIED**.

### 2. Double Jeopardy

In his second ground for relief, Petitioner contends that the trial court violated his right to be protected against double jeopardy or multiplicity of charges by permitting the State to proceed on four separate counts that relied on identical facts. "The Double Jeopardy Clause of the Fifth Amendment, applicable to the States through the Fourteenth, provides that no person shall 'be subject for the same offence to be twice put in jeopardy of life or limb.'" *Brown v. Ohio*, 432 U.S. 161, 164 (1977) (quoting U.S. Const. amend. V). In other words, "[t]he Double Jeopardy Clause prohibits 'successive prosecutions for the same offense as well as the imposition of cumulative punishments for the same offense in a single criminal trial.'" *United States v. Gregory*, 639 F. App'x 913, 915 (4th Cir. 2016) (quoting *United States v. Shrader*, 675 F.3d 300, 313 (4th Cir. 2012)). "Where a case involves multiple charges, the Double Jeopardy Clause is not offended where each charge requires proof of a distinct element." *Id.* (citing *Blockburger v. United States*, 284 U.S. 299, 304 (1932)); *see also Blockburger*, 284 U.S. at 304 ("[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not."); *United States v. Dixon*, 509 U.S. 688, 698 (1993) ("The same-elements test, sometimes referred to as the '*Blockburger*' test, inquires whether each offense contains an element not contained in the other; if not, they are the 'same offence' and double jeopardy bars additional punishment and successive prosecution."). A "defendant may be 'prosecuted simultaneously' for violating two statutes even though he ultimately could not be

convicted and punished for both offenses." *United States v. Locust*, 95 F. App'x 507, 517 (4th Cir. 2004) (citing *Ball v. United States*, 470 U.S. 856, 859–60 (1985)).

"[W]hen a defendant violates more than one statute in a single course of conduct, a court may impose multiple punishments without violating the Double Jeopardy Clause if the legislature authorizes it to do so." *United States v. Ayala*, 601 F.3d 256, 265 (4th Cir. 2010) (citing *United States v. Terry*, 86 F.3d 353, 355 (4th Cir.1996)). "Where consecutive sentences are imposed at a single criminal trial, the role of the constitutional guarantee is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense." *Brown v. Ohio*, 432 U.S. 161, 165 (1977) (citations omitted). "[T]he power to define criminal offenses and to prescribe the punishments to be imposed upon those found guilty of them, resides wholly with the [legislature]. *Whalen v. United States*, 445 U.S. 684, 689 (1980) (citations omitted). Thus, the district court's "only task is to determine whether [the legislature] intended to impose multiple punishments." *Ayala*, 601 F.3d at 265 (quoting *United States v. Chandia*, 514 F.3d 365, 372 (4th Cir.2008)). Thus, in applying the *Blockburger* test, the District Court's "'exclusive focus' is 'upon the elements of the statutory provisions in question,' not the particular facts of the underlying case. *United States v. Ayala*, 601 F.3d 256, 265 (4th Cir. 2010) (quoting *United States v. Allen*, 13 F.3d 105, 109 n.4 (4th Cir. 1993)).

Petitioner argues that it was a violation of double jeopardy for the trial court to permit the State to proceed against him for the offenses of felony murder, death of a child by a parent, and child neglect resulting in death. (ECF No. 2 at 8). Felony murder was submitted to the jury on the jury verdict form as Count 1. (ECF No. 18-11). Death of a child by a parent was submitted to the jury on the jury verdict form as Count 3. (*Id.*). Child

neglect resulting in death was submitted to the jury as on the jury verdict form as a lesser included offense of Count 3. (*Id.*). Petitioner argues that these counts failed the same transaction test set forth in *Blockburger,* and the trial court should have required the State to elect between charging Petitioner with felony murder or with death of a child by a parent.

The WVSCA noted on direct appeal that Petitioner was not convicted of the offense of death of a child by a parent and, consequently, did not suffer multiple punishments for both felony murder and death of a child by a parent. (ECF No. 18-18 at 19–20). The WVSCA also noted that Petitioner's counsel represented that Petitioner was not appealing his conviction with regard to child neglect resulting in death and, therefore, the WVSCA did not consider that issue. (*Id.*). In his Amended Petition for a Writ of Habeas Corpus Ad Subjiciendum to the state circuit court, Petitioner did raise the issue of double jeopardy based on his convictions for felony murder and for child neglect resulting in death. (ECF 18-23 at 28–31). Similarly, in the instant Petition, Petitioner raises the issue of double jeopardy caused by his convictions and consecutive sentencing for both Count 1 and Count 3. Therefore, the undersigned will consider that contention.

Petitioner argues that considering the facts of his case, the felony murder charge does not contain any elements that are not also contained in the child neglect resulting in death charge. Moreover, he claims that proof of the child neglect resulting in death charge necessarily requires proof of the felony murder charge. As such, the convictions were for the same alleged crime.

Applying the *Blockburger* test to the two statutes at issue here, felony murder under W. Va. Code § 61-2-1, and child neglect resulting in death under W. Va. Code § 61-8D-4a(a), the undersigned finds that the statutes contain different elements. As the

WVSCA stated in Petitioner's case:

> The elements which the State is required to prove to obtain a conviction of felony murder are: (1) the commission of, or attempt to commit, one or more of the enumerated felonies; (2) the defendant's participation in such commission or attempt; and (3) the death of the victim as a result of injuries received during the course of such commission or attempt.

(ECF No. 18-18 at 23) (quoting *State v. Mayle,* 357 S.E.2d 219 (W. Va. 1987) (emphasis omitted). In contrast, the elements for child neglect resulting in death are: "If any parent, guardian or custodian shall neglect a child under his or her care, custody or control and by such neglect cause the death of said child, then such parent, guardian or custodian shall be guilty of a felony . . . ." W. Va. Code § 61-8D-4a(a). Thus, the felony murder statute requires that a defendant participate in an underlying felony; the child neglect statute does not. The child neglect statute requires that the defendant be the parent, guardian, or custodian of the victim and have the victim under the defendant's care; the felony murder statute has no such requirement.

The trial court first heard argument on whether the elements of felony murder and child neglect resulting in death overlap in Petitioner's Motion to Elect and during the pretrial hearing argument on that Motion. (ECF Nos. 18-2 & 18-3). The trial court again heard argument on the issue during the trial, as the parties discussed drafting jury instructions and the verdict form. (ECF No. 18-10 at 12–20). The State argued that there was evidence in this case sufficient to support separate convictions on both counts. (*Id.*). Specifically, the State argued that there was evidence that Petitioner set in motion C.C.J.'s death by delivering oxycodone to C.C.J., which C.C.J. ingested putting C.C.J. in physical distress. (*Id.* at 18–19). There was further evidence of a period of time when C.C.J. was in Petitioner's care and Petitioner failed to save the child by timely rendering aid such as calling emergency services. (*Id.*). The State argued that it should be permitted to seek

punishment under separate statutes for both sets of behavior. The trial court found that

a jury could convict Petitioner of both counts. (*Id.* at 20).

    At trial, the trial court instructed the jury on the elements of both felony murder

and child neglect resulting in death. Regarding felony murder, the trial court said in

relevant part:

> Murder in the first degree is committed when any person in the commission
> of the delivery of a controlled substance causes the death of another person.
> Under the felony murder doctrine, murder in the first degree does not
> require proof of the elements of willfulness, deliberation, premeditation,
> malice or specific intent to kill. It is deemed sufficient in law if the death
> occurs during the commission of the delivery of a controlled substance.
>
> Delivery of oxycodone, a Schedule II narcotic controlled substance, is
> committed when any person unlawfully and feloniously delivers oxycodone,
> a Schedule II narcotic controlled substance, to another person.
>
> Before the defendant, Henry C. Jenkins, can be found guilty of murder in
> the first degree, a felony murder, as a result of the death of [C.C.J.] occurring
> during the commission of the felony crime of delivery of a controlled
> substance, the State of West Virginia must prove beyond a reasonable doubt
> the following: That the defendant, Henry C. Jenkins, in Fayette County,
> West Virginia, on or about November 14, 2008, did deliver oxycodone, a
> Schedule II narcotic controlled substance, to [C.C.J.] and that [C.C.J.] died
> as a result of the defendant committing the crime of delivery of a controlled
> substance.

(ECF No. 18-10 at 56–57). Regarding child neglect resulting in death, the trial court said

in relevant part:

>     Child neglect resulting in death, a felony, is committed when the
> parent of a child neglects that child who is in their care, custody and control
> and, by such neglect, causes the death of said child.
>
> . . . .
>
> In order to prove the commission of the offense of child neglect resulting in
> death, a felony, the State of West Virginia must prove beyond a reasonable
> doubt each of the following elements: That the defendant, Henry C. Jenkins,
> on or about the 14th day of November, 2008, in Fayette County, West
> Virginia, was the parent of [C.C.J.] and had [C.C.J.] in his care, custody and

44

> control and did neglect [C.C.J.] and that such neglect caused the death of
> [C.C.J.]

(*Id.* at 64, 66).

In short, the trial court instructed the jury that felony murder consisted of three elements: (1) the commission of the felony of delivery of a controlled substance, (2) the defendant's participation in such commission, and (3) the death of the victim as a result of such commission. The trial court additionally instructed the jury that child neglect resulting in death consisted of three elements: (1) a parent neglects a child, (2) that child is in the parent's care, (3) the neglect causes the death of the child. Petitioner argues that because the neglect in his case is the delivery of a controlled substance, the statutes contain identical elements as applied to his case, with the only difference being the additional specificity in the later statute regarding the identity of the defendant and victim. Petitioner's argument is unavailing. At trial, the State offered evidence showing that Petitioner neglected C.C.J. when he was in Petitioner's care by means other than delivery of a controlled substance, and that this neglect caused C.C.J.'s death. Specifically, the State offered the testimony of Ms. Burdette, Mr. Holcomb, and Mr. Neal of the 911 Call Center to demonstrate that Petitioner failed to promptly render aid to C.C.J. when he was in grave physical distress after taking oxycodone. (ECF No. 18-9 at 115–128). Accordingly, the undersigned **FINDS** that it was not a violation of double jeopardy to convict Petitioner on both counts.

Petitioner also contends that, regardless of which counts ultimately led to his conviction, his right to be free of double jeopardy was violated when the trial court allowed the State to charge, indict, and prosecute him on four counts which wholly overlapped: (1) felony murder, (2) delivery of a controlled substance, (3) death of a child by a parent,

and (4) child neglect resulting in death. However, the Fourth Circuit "has made it clear that 'the prosecutor [is permitted] to carve up criminal conduct into many counts so that technical problems with the evidence will not allow the true criminal to walk free ... even if some of the counts are ... constitutionally identical offenses.'" *Locust*, 95 F. App'x at 517 (alteration and second omission in original) (quoting *United States v. Luskin*, 926 F.2d 372, 374–75, 78 (4th Cir. 1991)). Thus, the double jeopardy inquiry is relevant only to the counts of conviction, not to counts for which Petitioner was unsuccessfully charged and prosecuted.

Therefore, the undersigned **FINDS** that the state court's decision on this claim is not contrary to, or an unreasonable application of, clearly established federal law and **RECOMMENDS** that Respondent's motion for summary judgment be **GRANTED** on Petitioner's ground for relief No. 2, and that Petitioner's request for habeas relief on that ground be **DENIED**.

### 3. Ineffective Assistance of Counsel

In his third ground for relief, Petitioner argues that his trial counsel was ineffective for numerous reasons. The Sixth Amendment to the United States Constitution guarantees a criminal defendant "the right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). While "assistance which is ineffective in preserving fairness does not meet the constitutional mandate . . . defects in assistance that have no probable effect upon the trial's outcome do not establish a constitutional violation." *Mickens v. Taylor*, 535 U.S. 162, 166 (2001). To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) that counsel's representation fell below an objective standard of reasonableness and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

46

proceeding would have been different. *Strickland*, 466 U.S. at 687–88, 694. When reviewing counsel's performance, the "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 690. Moreover, counsel's performance should be assessed with "a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time," and a court should not allow hindsight to alter its review. *Wiggins v. Smith*, 539 U.S. 510, 523 (2003). In addition, trial strategy devised after investigating the law and facts is "virtually unchallengeable." *Bell v. Evatt*, 72 F.3d 421, 429 (4th Cir. 1995).

In a § 2254 proceeding, the standard of review differs somewhat from the standard used in the direct review of a *Strickland*-based challenge where the state court adjudicated the petitioner's ineffective assistance of counsel claims on the merits. *Harrington v. Richter*, 562 U.S. 86, 101 (2011). "The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem review is doubly so." *Id.* at 105 (internal citations and quotations omitted). "'Surmounting *Strickland's* high bar is never an easy task[;]' … [e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Id.* (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)). When a state court has adjudicated an ineffective assistance of counsel claim on the merits in summary fashion, the issue is "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.* It is with these standards in mind that the undersigned turns to Petitioner's following claims of ineffective assistance of counsel.

### a. Telling the jury during opening statement that there was proof of delivery of oxycodone

In his first claim of ineffective assistance of counsel, Petitioner argues that his trial counsel was ineffective because counsel told the jury, during opening statement, that there was proof that Petitioner delivered oxycodone to C.C.J. (ECF No. 2 at 11–12). Petitioner argues that this is prejudicial because it essentially admits one element of the crime with which the State charged Petitioner. (*Id.*). To support this claim, Petitioner selectively quotes from the trial transcript. (ECF No. 18-8 at 96). In the quoted portion, trial counsel tells the jury that to prove felony murder in this case, the State must prove a delivery of a drug to C.C.J.; counsel goes on to state, "Well, there is proof of that." (*Id.*).

The state circuit court rejected this ineffective assistance of counsel claim because Petitioner took the small excerpt from the transcript completely out of context. (ECF 18-27 at 52–53). The state circuit court quoted the entire relevant portion of defense trial counsel's opening statement, as reproduced below:

> Now, on the night in question, the evidence is going to be that Henry Jenkins and [C.C.J.] -- and there are a number of other people in the trailer, and a couple of them went over to the house of Mr. Josh Settle. And [the Prosecutor] told you about Mr. Settle. And they went to Mr. Settle's house, and they purchased three pills.

> And I'm like [the Prosecutor]. I'm not a pharmacist. Oxycodone, roxycodone, roxicontin, Oxycontin. Basically, what it's going to come down to in your system is it's either metabolized as oxycodone or oxymorphone. And what I am to you-all is dangerous. I'm a lawyer with no clue what I'm talking about when it comes to pharmacy and I've got access to the internet. So I'm just doing the best I can here.

> *They got three pills from Josh Settle.* Now, as [the Prosecutor] said, what the State needs to prove here today to prove felony murder is that there was a delivery of a drug, a giving, a transfer of this drug to this young man so this young man had access to it.

*Well, there is proof of that. Josh Settle took a drug with [C.C.J.] in the room, knowing it would be there in his presence, and handed that drug over to Henry Jenkins.* Is Josh Settle guilty? No. The evidence is going to be Josh Settle has cut a deal, and he's got what we call immunity. He's not going to be charged with nothing.

*Now, there's a deal. There's a transfer. But Josh Settle? No. No. no. There's nothing there. We're not going to do anything with Josh. You'll hear him testify today, and he'll walk out of here.*

The State also has to prove, besides the transfer, that this drug was -- the oxycodone; we'll just call it that to make it simple -- is what led to the death of [C.C.J.].

Now, there were a number of people in the trailer that evening, and you're going to get to hear evidence and testimony from everyone who was there. Now, you may not think it's a pretty sight. You may not think a bunch of adults sitting and drinking and taking pills with kids coming in and out of the house is good or attractive or pretty, but that's reality. That's what happened here.

But you all have taken an oath to follow the law. *And the law is that the State has to prove there was a transfer. And the evidence from every single witness who was there that night is going to be, "I did not see Henry Jenkins give [C.C.J.] any drugs on the evening of November the 14th or the early morning hours of November 15th."* That's the evidence that you're going to hear.

(*Id.*) (emphasis added by state circuit court). The state circuit court observed that a fair reading of trial counsel's statements in context suggests that trial counsel's strategy was to minimize the effectiveness of strong negative evidence by conceding in opening that someone delivered drugs to C.C.J., and arguing that it was *not* Petitioner. Trial counsel confirmed that strategy during testimony at the omnibus habeas hearing before the state circuit court. (ECF 18-25 at 106–09). Counsel noted that it would have been impracticable to "run away" from the evidence that C.C.J. had been at Mr. Settle's home during an

exchange of drugs given the number of witnesses, the presence of drugs in C.C.J.'s system, and the presence of C.C.J.'s personal items at Mr. Settle's home. (*Id.* at 107–08).

The undersigned agrees with the state court that it was a reasonable strategy for trial counsel to try to minimize the negative effect of the delivery evidence by bringing it up during opening statements and trying to direct culpability away from Petitioner and onto Mr. Settle or others. If trial counsel had indeed conceded that Petitioner delivered oxycodone to C.C.J. that would have been prejudicial to Petitioner because that delivery was a necessary element of the State's case. However, when viewed in context, it is clear that trial counsel's statements made no such concession and instead served to redirect culpability *away* from Petitioner. Such trial strategy, devised after investigating the law and facts, is "virtually unchallengeable." *Bell* 72 F.3d at 429.

Therefore, the undersigned **FINDS** that the state court's decision on this claim is not contrary to, or an unreasonable application of, clearly established federal law. Thus, the undersigned **RECOMMENDS** that Respondent's motion for summary judgment be **GRANTED** on ground for relief no. 3(a), and that Petitioner's request for habeas relief on that ground be **DENIED**.

### b. *Failing to object to lay witness opinion on the legal weight of evidence*

In his second claim of ineffective assistance of counsel, Petitioner argues that his trial counsel was ineffective because counsel failed to object to lay witness, Det. Sizemore's, opinion regarding the legal weight of evidence. (ECF No. 2 at 12). Specifically, Petitioner asserts that the prosecution elicited testimony from Det. Sizemore regarding whether the evidence was sufficient to prove that Petitioner delivered oxycodone to C.C.J. (*Id.*). Petitioner claims that this testimony invaded the province of the jury, and trial

50

counsel was ineffective for failing to object. (*Id.*).

The state circuit court reviewed the relevant portion of Det. Sizemore's testimony, which occurred during redirect examination. (ECF No. 18-27 at 71–74). Specifically, Det. Sizemore testified that while there was no video evidence of Petitioner delivering drugs to C.C.J., and no testimony from C.C.J. because he was dead, there was circumstantial evidence in the case. (ECF No. 18-9 176–77). Det. Sizemore described as "consistent" statements by Holly Burdette, Josh Settle, Marshall Walker, and Shaun Stark; autopsy findings by Drs. Sabet and Kraner; and phone conversations between Petitioner and C.C.J.'s mother, Naomi Lucas Griffith. (*Id.*). Det. Sizemore also testified that Petitioner's recorded phone calls included confessions that Petitioner gave drugs to C.C.J. (*Id.*).

After reviewing the record, the state circuit court found that this testimony served as summation of prior evidence and testimony already before the jury. (ECF No. 18-27 at 72). As Petitioner's trial counsel testified during the state circuit court habeas omnibus hearing, trial counsel believed that Det. Sizemore was referring to facts already before the jury and that, as a matter of trial strategy, objecting might have been unhelpful because it would have emphasized facts that were damaging to Petitioner. (ECF No. 18-25 at 111). The state circuit court also observed that this testimony was elicited in response to defense counsel's line of questioning on cross-examination, in which counsel emphasized Det. Sizemore's report and letter to Dr. Sabet stating that it was unlikely the detective would be able to establish that Petitioner had given the drugs to C.C.J. (ECF No. 18-9 at 163–65, 172–75; ECF No. 18-27 at 72). Hence, Det. Sizemore's testimony on redirect regarding the amount of circumstantial evidence was rebuttal testimony to counter the defense's position that no evidence existed to prove that Petitioner delivered oxycodone to C.C.J.

The undersigned finds that Petitioner has not met his burden to show that trial counsel was ineffective by not objecting to Det. Sizemore's testimony. To the contrary, trial counsel's decision to forgo an objection was strategic and based on sound considerations. Det. Sizemore's testimony would likely have been admitted over objection as it was offered to rehabilitate the effect of testimony elicited by defense counsel on cross-examination. Trial counsel appropriately weighed the pros and cons of making an objection, considering both the likelihood that the objection would be overruled and the increased attention to the testimony that would follow an unsuccessful objection. Furthermore, Petitioner cannot show that Det. Sizemore's testimony was prejudicial under *Strickland,* because the testimony merely summarized evidence already before the jury.

Therefore, the undersigned **FINDS** that the state court's decision on this claim is not contrary to, or an unreasonable application of, clearly established federal law. Thus, the undersigned **RECOMMENDS** that Respondent's motion for summary judgment be **GRANTED** on ground for relief no. 3(b), and that Petitioner's request for habeas relief on that ground be **DENIED**.

### c. *Failing to object to inappropriate prejudicial remarks by the Prosecutor*

In his third claim of ineffective assistance of counsel, Petitioner argues that his trial counsel was ineffective because he failed to object to three inappropriate and prejudicial remarks made by the Prosecutor. (*Id.* at 13). First, Petitioner argues that his counsel should have objected to questions posed by the Prosecutor that improperly referenced Petitioner's decision not to testify. Petitioner raises this same concern under ground no. 4 of his petition, discussed *infra* Section III.4. As discussed in Section III.4, the challenged

questions, when viewed in context, were neither improper nor prejudicial, because they did not allude to Petitioner's decision not to testify. Thus, the lack of objection by Petitioner's trial counsel does not amount to ineffective assistance of counsel.

Second, Petitioner argues that his trial counsel should have objected to the Prosecutor's statement, "I would not have brought the case to the Grand Jury on the testimony of Holly Burdette." (ECF No. 2 at 13). Petitioner does not elaborate in his petition as to why he finds this statement to be improper or prejudicial; however, he suggests in his Objection to Respondent's Motion for Summary Judgment that the statement is improper because it comments on the strength of the State's evidence and the integrity of the Prosecutor in bringing the case. (ECF No. 33 at 22).

In closing argument, the Prosecutor stated: "I would not have brought this case to *you* [the petit jury] based *solely* on the testimony of Holly Burdette." (ECF No. 18-10 at 86) (emphasis added). The Prosecutor went on to explain that the State brought considerably more evidence to the jury, including the investigation performed by Det. Sizemore to corroborate Ms. Burdette's statements. (*Id.* at 86–88). The state circuit court analyzed the Prosecutor's statements in context and concluded that the statements did not refer to any evidence that was presented to only the grand jury and not the petit jury. (ECF No. 18-27 at 46–47). Instead, they were directly related to the prior trial testimony of Det. Sizemore regarding the course of his investigation, Ms. Burdette's role, and steps Det. Sizemore took to corroborate Ms. Burdette's testimony. (*Id.*). The state circuit court noted that Ms. Burdette and other witnesses where known users of illegal drugs whose testimony was vulnerable to impeachment. (*Id.*). Thus, the state circuit court found that the Prosecutor's statements about corroborating evidence were intended to overcome any credibility problems with Ms. Burdette's testimony. (*Id.*). Based on a review of this

53

statement in context, the undersigned agrees that Prosecutor's statement was not improper or prejudicial.  Furthermore, Petitioner makes no effort to demonstrate how the absence of those statements in closing argument would have changed the outcome of the trial.

Third, Petitioner points to the Prosecutor's statement during closing argument that a special needs child requires a special parent and "[t]he standard is higher for that person." (ECF No. 18-10 at 112). Again, Petitioner does not elaborate in the petition on his challenge to this statement, but in his Objection to Respondent's Motion for Summary Judgment, Petitioner indicates that the statement altered the legal duty applicable to Petitioner, requiring a higher legal duty because C.C.J. had special needs. (ECF No. 33 at 22).

The state circuit court reviewed this statement in the context of the surrounding statements and found that the Prosecutor was not arguing that a different legal standard applied. (ECF No. 18-27 at 48–49). Instead, the Prosecutor was merely refuting defense counsel's argument that the jury should not expect much of Petitioner considering his history of drug abuse. The Prosecutor argued that, to the contrary, Petitioner should have been more attuned to C.C.J.'s health needs given C.C.J's chronic health conditions, including cystic fibrosis and diabetes. Thus, Petitioner was neglectful when he failed to call emergency services during the period that C.C.J. was struggling to breath. (*Id.*). At the omnibus hearing, Petitioner's trial counsel noted that the Prosecutor's argument referred to the higher potential for injury to C.C.J. due to his health conditions rather than a higher legal standard that a defendant must meet in a murder case where the victim is a special needs child. (*Id.* at 29–30). As Dr. Sabet testified, C.C.J.'s health conditions did place C.C.J. at a higher risk of injury; specifically, because of C.C.J.'s cystic fibrosis he

might not have been able to metabolize an oxycodone dose of a level normally considered therapeutic. (ECF No. 18-8 at 228–29). Based on a review of this statement in context, the undersigned finds that the Prosecutor's statement was not improper or prejudicial because it referred to the C.C.J.'s threshold for injury, and Petitioner's knowledge of that threshold, rather than referring to a different legal standard for a murder conviction.

Therefore, the undersigned **FINDS** that the state court's decision on this claim is not contrary to, or an unreasonable application of, clearly established federal law. Thus, the undersigned **RECOMMENDS** that Respondent's motion for summary judgment be **GRANTED** on ground for relief no. 3(c), and that Petitioner's request for habeas relief on that ground be **DENIED**.

### d. *Failing to call or disclose any expert witness*

In his fourth claim of ineffective assistance of counsel, Petitioner argues that his trial counsel was ineffective because counsel failed to call or have available any expert witnesses. (ECF No. 2 at 13). Petitioner argues that a medical expert was necessary to counter testimony by Drs. Kraner and Sabet, especially on the issue of whether oxycodone resulted in C.C.J.'s death. (*Id.*). Petitioner also argues that his trial counsel failed to consult or talk to any expert other than Drs. Kraner and Sabet and he points to his trial counsel's opening statement regarding counsel's lack of medical knowledge. (*Id.*). Petitioner argues that trial counsel's failure to independently investigate the medical issues renders the trial strategy inadequate. (ECF No. 33 at 22–24).

The state circuit court heard extensive testimony on this issue at the omnibus hearing. The state circuit court found that Petitioner's trial counsel reviewed the medical and toxicological issues, including thoroughly reviewing medical records, traveling to medical facilities, and interviewing medical professions regarding issues of likely

55

relevance at Petitioner's trial. (ECF No. 18-27 at 58–64). After reviewing Petitioner's trial counsel's testimony at the omnibus hearing, the undersigned agrees with the state circuit court that counsel conducted an independent investigation of the medical issues. In particular, trial counsel visited with the medical examiner and toxicologist, reviewed the medical records, and demonstrated a firm understanding of the issues. (ECF No 18-25 at 51, 54, 83, 136–40). The undersigned views trial counsel's opening statements regarding a personal lack of medical knowledge as a tactic to connect with the jury rather than an assertion of a lack of independent investigation and preparation.

At the omnibus hearing, Petitioner's trial counsel testified that the decision not to call a medical expert was a matter of strategy given the defense's causation theory of the case. (ECF No. 18-25 at 136–40). Trial counsel thought that, because the State had indicted Petitioner for felony murder due to delivery of oxycodone, the State's own experts' testimony that C.C.J.'s death was caused by a combination of both oxycodone and benzodiazepine would be helpful. (*Id.*). Trial counsel did not think that the presence of both oxycodone and benzodiazepine in C.C.J.'s system was something that another expert would be able to refute. (*Id.*). Instead, trial counsel chose to use the State's experts' testimony that C.C.J.'s death was caused by a combination of those drugs to benefit the defense's causation theory. (*Id.*). Such trial strategy devised after investigating the law and facts is "virtually unchallengeable." *Bell* 72 F.3d at 429.

The state circuit court also found that Petitioner had not presented evidence beyond his own speculation to show that calling an expert would have altered the outcome of his trial. (ECF No. 18-27 at 58–64). The undersigned agrees that Petitioner has failed to present any evidence beyond speculation as to the substance of a purported expert witness's testimony in this case. Petitioner has not proffered the testimony of an expert,

56

nor supplied an expert's affidavit including the anticipated testimony. Without either, Petitioner fails to demonstrate how the testimony of an expert would have altered the outcome of his trial. *Green v. Ballard*, No. CIV.A. 3:02-1348, 2015 WL 1612198, at *3 (S.D. W. Va. Apr. 10, 2015) ("Moreover, Petitioner has not shown that, had an expert been called for the defense, there is a reasonable probability that the result of the trial would have been different.")

Therefore, the undersigned **FINDS** that the state court's decision on this claim is not contrary to, or an unreasonable application of, clearly established federal law. Thus, the undersigned **RECOMMENDS** that Respondent's motion for summary judgment on ground for relief no. 3(d) be **GRANTED,** and that Petitioner's request for habeas relief on that ground be **DENIED**.

### e. *Failing to object to leading questions*

In his fifth claim of ineffective assistance of counsel, Petitioner argues that his trial counsel was ineffective because counsel failed to object to the State's extensive and prejudicial use of leading questions. (ECF No. 2 at 14). In the instant Petition, Petitioner does not point to specific instances of problematic leading questioning. (*Id.*). However, Petitioner provided a sample of leading questions in his Amended Petition to the state circuit court and that court heard extensive testimony on the matter at the omnibus hearing. (ECF Nos. 18-23 at 21 & 18-25 at 33-45, 169—73). The state circuit court reviewed the record and found that trial counsel did not lodge objections to leading questions for tactical or strategic reasons and that trial counsel was not deficient under an objective standard of reasonableness. (ECF No. 18-27 at 75—78). After reviewing the record,[3] the

---

[3] Neither party provided a copy of the exhibit to Petitioner's state Amended Petition that lists the sample leading questions, however, the undersigned has reviewed the omnibus hearing transcript where these questions are discussed.

undersigned agrees. Certain questions highlighted at the omnibus hearing likely referred back to evidence already before the jury, were introductory in nature, or used to develop testimony on immaterial facts. (ECF Nos. 18-23 at 21 & 18-25 at 33–45, 169–73). Trial counsel also provided cogent reasons why questions *should* not be objected to where objections *could* be made. For example, counsel explained that it is counterproductive to object repeatedly on minor points, especially if objections are not granted. Counsel added that sometimes it was less damaging to the defense to allow the State to say certain words than to have the jury hear the words directly from the witnesses. Furthermore, counsel pointed out that getting unfavorable witnesses off the stand quickly was often more important than objecting to leading questions, which only prolonged the damage. (*Id.*).

The state circuit court concluded that Petitioner also failed to show prejudice. (ECF No. 18-27 at 75–78). The undersigned agrees. Petitioner makes the general assertion that prejudice can be presumed because his trial counsel did not force the State to follow the rules of evidence. However, had trial counsel's objections been sustained, the Prosecutor would have been given an opportunity to rephrase the questions. As such, the repetition would have served to highlight the subject matter to the jury. Petitioner simply cannot demonstrate that any material evidence would have been kept from the jury through additional objections by counsel.

Therefore, the undersigned **FINDS** that the state court's decision on this claim is not contrary to, or an unreasonable application of, clearly established federal law. Thus, the undersigned **RECOMMENDS** that Respondent's motion for summary judgment on ground for relief no. 3(e) be **GRANTED,** and that Petitioner's request for habeas relief on that ground be **DENIED**.

### f. *Failing to object to substantive testimony regarding exhibits marked for identification only*

In his sixth claim of ineffective assistance of counsel, Petitioner argues that his trial counsel was ineffective because, on several occasions, counsel failed to object to substantive testimony regarding exhibits the State had marked for identification, but had not admitted into evidence. (ECF No. 2 at 14). In the instant Petition, Petitioner does not point to specific exhibits or testimony. (*Id.*). However, Petitioner argued before the state circuit court that his counsel failed to object to (1) State's Exhibits 6, 7, and 8: photographs of blood vials, and (2) State Exhibit 5: a portion of the Plateau Medical Center's medical records. (ECF No. 18-27 at 78–80).

In the Objection to Respondent's Motion for Summary Judgment, Petitioner only offers argument about the photographs of blood vials and does not discuss the Exhibit 5 medical records. (ECF No. 33 at 25). Although trial counsel did not initially object to testimony about the photographs, the trial court later entered those photographs into evidence over trial counsel's objection. (ECF No. 18-8 at 188–90). Thus, Petitioner cannot show prejudice given that  an earlier objection would simply have resulted in an earlier admission of the photographs into evidence. The result of Petitioner's trial would not have changed.

Petitioner's trial counsel never objected to the use of State Exhibit 5; however, the State did not seek to use the exhibit for any purpose beyond refreshing the recollection of witness Leslie Tweedie with regard to whether she conducted a test of C.C.J.'s blood sample. (ECF No. 18-27 at 167–72). In the instant Petition, Petitioner does not make any argument regarding this exhibit.

Therefore, the undersigned **FINDS** that the state court's decision on this claim is not contrary to, or an unreasonable application of, clearly established federal law. Thus, the undersigned **RECOMMENDS** that Respondent's motion for summary judgment on ground for relief no. 3(f) be **GRANTED,** and that Petitioner's request for habeas relief on that ground be **DENIED**.

### g. *Failing to object to or seek a curative instruction for lay witnesses testifying as experts*

In his seventh claim of ineffective assistance of counsel, Petitioner argues that his trial counsel was ineffective because counsel failed to object to "the State's pervasive tactic of eliciting expert testimony from lay witnesses on a multitude of issues." (ECF No. 2 at 15). Petitioner points to two specific instances of such testimony: (1) asking the victim's mother, Naomi Lucas Griffith, about the classification and use of the drug Klonopin and (2) eliciting testimony from Det. Sizemore "on the classification of Oxycodone, side effects associated with overdose, and dosage." (*Id.*; ECF No. 33 at 25–26).

At trial, Ms. Griffith testified regarding an incident that occurred in October 2007 when Petitioner told her that he had given "some Klonipins" to C.C.J. (ECF 18-9 at 31–34). During that testimony, the State elicited the following testimony from Ms. Griffith without objection by Petitioner's trial counsel:

Q:     Is Klonopin some sort of pain medication?

A:     More like a nerve medication.

Q:     It's a prescription pill of some kind?

A:     Yes.

(*Id.* at 33). Petitioner argues that this was improper expert testimony by a lay witness and that the testimony prejudiced him because the prosecution used the testimony to create

an inference that Petitioner's past history of giving prescription drugs to C.C.J. made it more likely that he would give oxycodone to C.C.J. (ECF No. 33 at 26).

The state circuit court found that trial counsel made a reasonable tactical decision not to object to the testimony of Ms. Griffith and that Petitioner had not shown that the limited testimony caused Petitioner prejudice. At the omnibus hearing, trial counsel testified that she did not object to these questions because counsel thought it was tactically helpful to the defense that Klonopin was a nerve medication rather than a pain pill and because Ms. Griffith, a prior drug user with some personal knowledge of drugs, could testify as a lay witness to the specific question about whether Klonopin was a prescription pill. (ECF No. 18-25 at 63–65, 158–60). Trial counsel further testified, "I'm going to say there *could* have been an objection there. I won't say that there *should* have been an objection there." (*Id.* at 160).

After reviewing the full trial testimony of Ms. Griffith, the undersigned agrees that it was not deficient for trial counsel not to object to this limited testimony. The record reflects that at the 404(b) hearing, Ms. Griffith was permitted, over defense counsel's objection, to give testimony regarding Klonopin and Seroquel, because of her significant experience with prescription medications. (ECF No. 18-3 at 20). Accordingly, defense counsel would have had no reason to believe that a similar objection at trial would be sustained. While the overall story told by Ms. Griffith may have been quite damaging to Petitioner, the fact that Klonopin is a prescription medication was not the crux of the story, and an objection would not have prevented the story from being presented to the jury. Further, trial counsel's determination that Ms. Griffith's description of Klonopin as a nerve medication, rather than a pain medication, was helpful testimony was not objectively unreasonable.

61

The state circuit court also considered Petitioner's claim that Det. Sizemore offered expert testimony. The state circuit court noted that, at the omnibus hearing, habeas counsel asked only one question relevant to this claim and made no further effort to develop a supporting record. (ECF No. 18-27 at 81–82). The state circuit court found that Det. Sizemore's testimony about the medications was not expert testimony, but instead related to a Board of Pharmacy report that Det. Sizemore obtained during his investigation. (*Id.*). Petitioner does not point to any other testimony by Det. Sizemore as constituting expert testimony by Det. Sizemore, nor does he show prejudice caused by any such testimony.

Therefore, the undersigned **FINDS** that the state court's decision on this claim is not contrary to, or an unreasonable application of, clearly established federal law. Thus, the undersigned **RECOMMENDS** that Respondent's motion for summary judgment on ground for relief no. 3(g) be **GRANTED,** and that Petitioner's request for habeas relief on that ground be **DENIED**.

### h. *Failing to object and seek curative instruction regarding the medical examiner witness improperly bolstering the credibility of the investigating officer witness*

In his eighth claim of ineffective assistance of counsel, Petitioner argues, "Petitioner's trial counsel failed to object and ask for a curative instruction when the Medical Examiner inappropriately bolstered the credibility of the investigating officer." (ECF No. 2 at 15). Petitioner argues that counsel should have objected to the following testimony by the medical examiner, Dr. Sabet:

Q:    [W]as there anything . . . inconsistent with what Detective Sizemore shared with you in terms of his investigation?

A:    Based on information that -- I trust law enforcement, generally, -- it's consistent -- autopsy findings were consistent with the findings.

(ECF No. 18-8 at 241–42).

At the omnibus hearing, trial counsel testified that this testimony was tactically useful because it supported the defense's argument to the jury that the listed cause of death was not based on an independent medical examination, but rather was a mere rubber stamp of Detective Sizemore's opinion. (ECF No. 18-25 at 69–70). Trial counsel testified as to hoping that this would undermine the medical examiner's conclusions, especially because the cause of death in final autopsy report differed from that on the initial death certificate. (*Id.*). Trial counsel pursued this theory on cross-examination and during closing arguments. (ECF Nos. 18-8 at 230–31 & 18-10 at 100-02). The state circuit court found that choosing not to object to this testimony was something that a reasonably proficient defense attorney might do. (ECF No. 18-27 at 74–75). The undersigned agrees that this was an objectively reasonable defense strategy.

Therefore, the undersigned **FINDS** that the state court's decision on this claim is not contrary to, or an unreasonable application of, clearly established federal law. Thus, the undersigned **RECOMMENDS** that Respondent's motion for summary judgment on ground for relief no. 3(h) be **GRANTED,** and that Petitioner's request for habeas relief on that ground be **DENIED**.

### *i. Failing to call witnesses to authenticate hospital records regarding prior treatment and hospitalization of C.C.J.*

In his ninth claim of ineffective assistance of counsel, Petitioner argues, "Petitioner's trial counsel failed to call or have appropriate witnesses available to authenticate hospital records for C.C.J. involving his prior treatment and hospitalization." (ECF No. 2 at 15). The petition does not allege anything beyond this one sentence and does not clarify the content of the records or what effect they might have had on the trial.

Petitioner argued to the state circuit court that his trial counsel did not have an available witness to authenticate a medical record regarding a past hospitalization of C.C.J. caused by Petitioner's mother misinforming Petitioner's maternal grandmother, Patricia Paruscio, of the dosage of C.C.J.'s medication. (ECF No. 18-27 at 65–66). The state circuit court held an omnibus hearing to provide Petitioner a chance to clarify his allegation and demonstrate how any failure would have caused him prejudice. At the hearing, Petitioner's habeas counsel only elicited minimal testimony from trial counsel on this issue. (ECF No. 18-25 at 162–64). At the omnibus hearing, the Petitioner did not enter the medical record into evidence. (ECF No. 18-27 at 66). The state circuit court found Petitioner's allegation speculative and noted that Petitioner had failed to demonstrate that the line of questioning was important, failed to show the content of the medical records, and failed to present any evidence of prejudice. (*Id.*).

In the instant Petition, Petitioner does not add anything new to show prejudice. In an attempt to save this claim, Petitioner argues in his Objection to Respondent's Motion for Summary Judgment that the records of a prior hospitalization were important because "Defense counsel wanted to establish that [C.C.J.'s] mother had given him an overdose of medication also." (ECF No. 33 at 27). However, even if true, an accidental overdose of prescribed medication given to C.C.J. months before his death, and at the direction of his mother, was irrelevant to whether Petitioner gave C.C.J. non-prescribed medication on November 14, 2008. Petitioner has failed to demonstrate prejudice based on the absence of an authenticating witness.

Therefore, the undersigned **FINDS** that the state court's decision on this claim is not contrary to, or an unreasonable application of, clearly established federal law. Thus, the undersigned **RECOMMENDS** that Respondent's motion for summary judgment on

ground for relief no. 3(i) be **GRANTED,** and that Petitioner's request for habeas relief on that ground be **DENIED**.

### j.  *Failing to establish the timeline of when blood was drawn from C.C.J. to test for toxicology*

In his tenth claim of ineffective assistance of counsel, Petitioner argues that his trial counsel was ineffective because counsel failed to adequately establish when C.C.J.'s blood was drawn for toxicology testing. (ECF No. 2 at 15). Petitioner argues that the timeline was essential to establish whether drugs identified in C.C.J.'s blood were administered by hospital staff. (*Id.*).

The state circuit court rejected this ineffective assistance of counsel claim. (ECF No. 18-27 at 67–69). The court found that the timeline of the blood draw was established by the testimony of C.C.J.'s emergency room treating physician, Dr. Poland, and was in fact clarified by trial counsel's cross-examination of Dr. Poland. (*Id.*). Dr. Poland testified on direct examination that he did not provide any oxycodone to C.C.J. and only provided Ativan, a benzodiazepine, after the blood draw. (ECF No. 18-8 at 134). The trial transcript does demonstrate some initial confusion about the time of the blood draw. (*Id.* at 134, 136–37). However, on cross-examination, trial counsel questioned Dr. Poland on this issue. Dr. Poland testified that there were two blood draws, first a finger stick at 10:48 a.m. to test C.C.J.'s blood sugar, and then several vials of blood were drawn at 11:14 a.m. to send from toxicology screening. (*Id.* at 136–37). This testimony was corroborated by both Ms. Workman, who recorded the blood draw in the hospital records, and Ms. Keffer, who assisted Dr. Poland with the blood draw and handed the blood to the laboratory technician. (*Id.* at 144–60).

65

Therefore, the undersigned **FINDS** that the state court's decision on this claim is not contrary to, or an unreasonable application of, clearly established federal law. Thus, the undersigned **RECOMMENDS** that that Respondent's motion for summary judgment on ground for relief no. 3(j) be **GRANTED,** and that Petitioner's request for habeas relief on that ground be **DENIED**.

### k.  Ineffective Assistance of Counsel Conclusion

The Fourth Circuit recently reminded district courts that a state court decision on the merits of an ineffective assistance of counsel claim should be "given the benefit of the doubt," and that the standard for overcoming AEDPA deference requires "a state prisoner [to] show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Jones v. Clarke*, 783 F.3d 987, 991, 993 (4th Cir. 2015) (quoting *Cullen*, 563 U.S. at 181, and then *Harrington*, 562 U.S. at 103). Having thoroughly considered the matter, the undersigned finds that Petitioner has not met that burden here.

Accordingly, the undersigned **FINDS** that the state court's decision on this claim is not contrary to, or an unreasonable application of, clearly established federal law. Thus, the undersigned **RECOMMENDS** that Respondent's motion for summary judgment on ground for relief no. 3 be **GRANTED,** and that Petitioner's request for habeas relief on that ground be **DENIED**.

### 4.  Prosecutorial Misconduct

In his fourth ground for relief, Petitioner contends that the Prosecutor improperly referred to Petitioner's silence and elicited testimony regarding Petitioner's silence in

violation of his constitutional right against self-incrimination. (ECF No. 2 at 17).[4] It is well established that a defendant in state court has a constitutional right to have the Prosecutor refrain from commenting on his decision not to testify. U.S. Const. amends. V, XIV. *Griffin v. California*, 380 U.S. 609, 615 (1965) ("[T]he Fifth Amendment, in its direct application to the Federal Government and in its bearing on the States by reason of the Fourteenth Amendment, forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt."); *Malloy v. Hogan*, 378 U.S. 1, 6 (1964) ("[T]he Fifth Amendment's exception from compulsory self-incrimination is also protected by the Fourteenth Amendment against abridgment by the States.").

"When specific guarantees of the Bill of Rights are involved," federal courts must take "special care to assure that prosecutorial conduct in no way impermissibly infringes them." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). "By contrast, when such provisions are not at issue, a finding of error as to a prosecutor's remark [or conduct] requires that it 'so infected the trial with unfairness as to make the resulting verdict a denial of due process.'" *United States v. Runyon*, 707 F.3d 475, 507 (4th Cir. 2013) (quoting *DeChristoforo*, 416 U.S. at 643). For example, when a prosecutor offers remarks that touch on a defendant's privilege against self-incrimination, a court must determine whether those statements "so prejudiced [the] specific right . . . as to amount to a denial of that right." *Donnelly*, 416 U.S. at 643. On the other hand, where a prosecutor's comments or conduct do not implicate a particular constitutional right held by the defendant, then the analysis centers on whether the prosecutor's conduct generally

---

[4] Petitioner also raises this concern under Ground 3 of his Petition, discussed supra Section III.4.c, where he argues that his trial counsel's failure to object to prosecutorial misconduct violated Petitioner's constitutional right to effective assistance of counsel.

violated a defendant's right to due process. *Id.* "[A] court making [this] due process inquiry must consider the challenged conduct in relation to the proceeding as a whole." *Humphries v. Ozmint*, 397 F.3d 206, 218 (4th Cir. 2005). "The analysis of a due process claim premised on unfair prosecutorial conduct . . . depend[s] upon numerous factors, which include the nature of the prosecutorial misconduct, the extent of the improper conduct, the issuance of curative instructions from the court, any defense conduct inviting the improper prosecutorial response, and the weight of the evidence." *Id.* (citations omitted). With these standards in mind, the undersigned turns to Petitioner's specific claims of prosecutorial misconduct.

In this case, Petitioner points to testimony the Prosecutor elicited on redirect during the State's case-in-chief and during the rebuttal portion of the Prosecutor's closing argument. Below is the relevant testimony and argument, starting with questioning of Det. Sizemore by defense trial counsel on cross-examination during the State's case-in-chief:

[DEFENSE TRIAL COUNSEL:]

Q:      Okay. And in these -- in this report, this case, you did both of those; is that right? Put together a complaint and also a report of investigation.

A:      Yes, sir. That's correct.

....

Q:      All right. Do you remember in your original criminal complaint stating that, "It cannot be positively determined at this time whether [Petitioner] Henry Jenkins administered illegal controlled substances to the decedent or merely allowed the decedent to ingest these illegal controlled substances"?

A:      Yes, sir. That sounds like something I've written.

....

Q:     Do you remember stating on Page 11 of the report of investigation that, quote, Given the absence of a truthful statement by Henry Jenkins there is no way to prove beyond a reasonable doubt that Henry Jenkins actually administered either diazepam or oxycodone to the decedent?

A:     Yes, sir. Again, that sounds like the -- something that I made a direct quote of, if I could go a little bit further with that.

Q:     Did you --

[PROSECUTOR]:

Your Honor, if I may interpose, I believe that he asked for permission to explain his response. I'd like him to be given an opportunity.

THE COURT:

Well, you hold that thought, Detective Sizemore, and I feel certain that [the Prosecutor] may want to redirect some questions toward that area to allow you to expound on that.

(ECF No. 18-9 at 163–65). After this colloquy, defense trial counsel continued to cross-examine Det. Sizemore, moving to a new line of questioning. On redirect examination, the Prosecutor returned to this line of questioning, questioning Det. Sizemore as follows:

[PROSECUTOR:]

Q:     Detective Sizemore, if I could ask you to recall the original question about your belief or your opinion, if you will, as to the proof that [Petitioner] Mr. Jenkins actually delivered these drugs to his son, and I believe you wanted to answer the question more fully but didn't get the opportunity. So I would ask you, if you'd like to, you may explain yourself and your reasoning.

A:     Unlike a lot of drug cases, we don't have a video of a controlled purchase in this case. [C.C.J.] is dead, and he can't tell us who gave him the drugs.

But all -- all -- of the circumstantial evidence that we've gathered in this case -- the Holly Burdette statement, the phone conversations between Henry Jenkins and Naomi Lucas Griffith, the statement

69

from Josh Settle, statements from Marshall Walker and Shaun Stark, the autopsy findings from Dr. Sabet and Dr. Kraner -- everything that we've gathered is consistent.

There's some minor discrepancies here and there on facts that may not mean anything, but there's no question [C.C.J.] had oxycodone and Valium in his system. Henry Jenkins obtained oxycodone from Josh Settle. And those drugs were a contributing factor towards this child's death.

Q:    And isn't it true, Detective, that in at least two of the phone calls that we all heard, this man indicated he gave the drugs to his son, confessed it? Is that true?

A:    Yes, sir.

Q:    So when I ask you to refer back to your police report, Page 11, and this sort of summarizes everything in the police report, when you said, "Given the absence of a truthful statement by Henry Jenkins, there's no way to prove beyond a reasonable doubt," so on and so forth, in fact, we have, we would assume, a truthful statement from Henry Jenkins, don't we?

A:    In essence, yes, sir.

(*Id.* at 176–77). During closing arguments the day after this testimony, the Prosecutor made the following statements during the rebuttal portion of his closing argument:

[PROSECUTOR:]

But am I here to win? No. I'm here to make sure that truth comes forward and justice comes out of it. And when Jim Sizemore said, "I cannot tell you, short of a statement from the defendant, Mr. Jenkins, beyond a shadow of a doubt" or what have you "that a delivery occurred," well, that's true, isn't it? Because, you know, in the mob there's a saying, "Two people can keep a secret if one of them's dead." How are you ever going to prove that when the recipient died?

Well, we'll talk about circumstantial evidence. And I think both of the ladies who said they didn't really like circumstantial evidence are here, so I've got my work cut out for me today, but that's all right, I'm going to tell you about something.

(ECF No. 18-10 at 106–07). Immediately following these statements, the Prosecutor began a detailed explanation of the difference between direct evidence and circumstantial evidence. (*Id.* at 107–09).

Petitioner argues that the above testimony violated his constitutional rights against self-incrimination because the Prosecutor elicited testimony from Det. Sizemore about the absence of a truthful statement, and then during rebuttal closing argument, the Prosecutor referenced the absence of a truthful statement by Petitioner. (ECF No. 2 at 17). Petitioner notes that the trial court had ruled that a statement Petitioner gave to police was inadmissible except for impeachment purposes and that Petitioner chose to remain silent rather than take the witness stand. (*Id.*). In his state habeas petition, Petitioner advanced two arguments about these statements. (ECF No. 18-23 at 28). First, Petitioner argued that the statements served to remind the jury that Petitioner had not taken the witness stand. (*Id.*). Second, Petitioner argued that the statements referred to the inadmissible evidence of Petitioner's suppressed police statement. (*Id.*).

The state circuit court focused on the latter argument. That court reviewed the record and found that these statements did not refer to Petitioner's suppressed statement, but instead referred to recordings of two phone conversations between Petitioner and Ms. Griffith, C.C.J.'s mother, in which Petitioner admitted to giving C.C.J. drugs. (ECF No. 18-27 at 34–39). Unlike the suppressed police statement, the phone conversation recordings were admitted into evidence. (*Id.*).

The state circuit court did not directly address Petitioner's argument that the testimony or closing argument drew the jury's attention to Petitioner's decision not to take the witness stand. (*Id.*). Nonetheless, that court found that even if the testimony and closing argument were improper, they did not cause sufficient prejudice to reverse the

convictions for three reasons. (*Id.*). First, considering the context of the surrounding facts and questioning, the jury was unlikely to be misled. (*Id.*). Second, the comments were isolated, appearing only once during the State's case-in-chief and once during the State's rebuttal closing argument. (*Id.*). Third, the comments referenced recordings of conversations that had been played to the jury and referenced testimony about those recordings. (*Id.*).

The undersigned agrees with the state court that these statements, viewed in context, referred to the call recordings that were played to the jury, rather than to Petitioner's suppressed statement to police. Thus, the statements Petitioner points to do not refer to suppressed evidence and are not improper for that reason. However, the state circuit court did not directly analyze Petitioner's argument that these statements refer to Petitioner's decision not to testify, and that the statements hint that the State would not have charged Petitioner or brought him to trial if Petitioner had testified. (ECF No. 2 at 17). This is Petitioner's main argument on this ground of his federal habeas Petition. (*Id.*). Thus, the undersigned considers that argument here.

Petitioner first points to the Prosecutor's questioning of Det. Sizemore's on redirect examination where the Prosecutor refers to the statement, "Given the absence of a truthful statement by [Petitioner] Henry Jenkins, there's no way to prove beyond a reasonable doubt . . ." that appears in Det. Sizemore's police report. (ECF Nos. 2 at 17 & 18-9 at 177). However, Petitioner does not provide context for that language. As the reproduced relevant testimony above shows, it was actually defense trial counsel, not the Prosecutor, who first questioned Det. Sizemore about this language in the police report. It was likely trial counsel's strategy to point to Det. Sizemore's own written doubts about proving Petitioner's guilt in order to weaken the State's case. This line of questioning

72

opened the door to the Prosecutor to rehabilitate Det. Sizemore and rebut the initial police report assessment. The Prosecutor did this by eliciting testimony about circumstantial evidence and by noting that there were in fact recorded statements by Petitioner that the jury had already heard, the phone calls between Petitioner and C.C.J.'s mother, Ms. Griffith. Thus, the Prosecutor's conduct was proper here because Petitioner opened the door to this line of questioning.

Petitioner also points to the Prosecutor's statements during closing argument where the Prosecutor states:

> And when Jim Sizemore said, "I cannot tell you, short of a statement from the defendant, Mr. Jenkins, beyond a shadow of a doubt" or what have you "that a delivery occurred," well, that's true, isn't it? Because, you know, in the mob there's a saying, "Two people can keep a secret if one of them's dead." How are you ever going to prove that when the recipient died?

(ECF Nos. 2 at 17 & 18-10 at 106–07). However, in context, it is apparent that the Prosecutor was simply referring to the testimony from the State's case-in-chief quoted above. Additionally, the Prosecutor would have recognized that a weakness in the State's case was the lack of direct evidence of an oxycodone transfer. During this portion of his closing argument, the Prosecutor acknowledged the lack of direct evidence and went on to explain the difference between direct evidence and circumstantial evidence. (ECF No. 18-10 at 107–09). Thus, the Prosecutor's closing argument was proper because it referenced testimony properly before the jury.

Therefore, the undersigned **FINDS** that the state court's decision on this claim is not contrary to, or an unreasonable application of, clearly established federal law. Thus, the undersigned **RECOMMENDS** that Respondent's motion for summary judgment on ground for relief no. 4 be **GRANTED,** and that Petitioner's request for habeas relief on that ground be **DENIED**.

IV.   **Proposal and Recommendations**

The undersigned respectfully **PROPOSES** that the District Court confirm and accept the foregoing findings and **RECOMMENDS** as follows**:**

1. That Petitioner's Motion for Summary Judgment (ECF No. 15) and Petitioner's Renewed Motion for Summary Judgment (ECF No. 25) be **DENIED**;

2. That Respondent's Motion for Summary Judgment (ECF No. 18) be **GRANTED**;

3. That Petitioner's Petition for a Writ of Habeas Corpus by a Person in State Custody, (ECF No. 2), be **DENIED**; and

4. That this action be **DISMISSED with prejudice** and removed from the docket of the court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b) of the Federal Rules of Civil Procedure, Petitioner shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be

provided to the opposing party, Judge Copenhaver, and Magistrate Judge Eifert.

The Clerk is instructed to file this "Proposed Findings and Recommendations" and to mail a copy of the same to Petitioner and Respondent.

**FILED:** May 2, 2017

Cheryl A. Eifert
United States Magistrate Judge